Dora E. Norton, Administratrix of Estate of John Henry Norton, v. William H. Wheelock and William G. Bierd, Receivers of Chicago & Alton Railroad Company, Appellants.—20 S. W. (2d) 142.

Division One, September 13, 1929.

914

*Jones, Hocker, Sullivan & Angert* for appellant.

*Charles P. Noell* and *Hensley, Allen & Marsalek* for respondent.

LINDSAY, C.—The plaintiff is the widow of John H. Norton, deceased, and sues as administratrix of his estate for the benefit of herself as widow. The suit is brought under the Federal Employers' Liability Act, for damages sustained through the death of her husband, alleged to have been caused by the negligence of the defendants. At the time of his death and for several years prior thereto, Norton was employed by the defendants, receivers, in their yards at Venice, Illinois, as a car inspector, and a part of his duty was making light repairs upon cars in said yards. The petition alleges these facts and that upon the occasion of the death of Norton, certain cars were standing on the track in said yards designated as track 8; that Norton was at work as car inspector and light-repair man on track 8; that the cars standing on track 8 contained wares and merchandise billed to various other states of the United States and that said Norton was engaged in interstate commerce with the defendants, at the time of his mortal injury; that while he was employed as car inspector and repair man, on said track 8, a train or cut of cars in charge of defendants' agents, was kicked against the standing cars at which Norton was at work, causing the standing cars to run over him, and resulting in his death.

Negligence is charged in two respects, as follows:

"(1) Defendants' agents and employees in charge of said engine and train or cut of cars negligently and carelessly caused said train or cut of cars to be kicked by said engine into track 8 aforesaid and against a train or cut of cars standing in track 8 aforesaid about which John Henry Norton, now deceased, was working as aforesaid, when they knew, or by the exercise of ordinary care on their part could have known, that said John Henry Norton was on track 8

employed about the cut of cars or train standing in track 8, and at a place where the movement of said cars was likely to injure him.

"(2) Defendants' agents and employees in charge of and directing the movement of said engine and train or cut of cars negligently and carelessly caused said train or cut of cars to be kicked into and against the cars about which John Henry Norton, now deceased, was employed on track 8 in defendants' yards at Venice, Illinois, as aforesaid, without warning him that said train or cut of cars was about to be kicked by said engine into and against said cars standing on track 8 as aforesaid, and about which said John Henry Norton was then working, when the agents and employees of defendants knew, or by the exercise of ordinary care could have known, that John Henry Norton, now deceased, was so working as aforesaid, and would likely be injured by said train or cars so operated."

The answer is a general denial, followed by a plea of contributory negligence wherein defendants alleged:

"That the death of said John Henry Norton was the result of his failure to exercise ordinary care for his own safety in that the said John Henry Norton negligently and carelessly went under the car described and mentioned in the petition or crossed track 8 between cars thereon when he knew, or by the exercise of reasonable care could have known, that cars were being switched in on track No. 8 and other tracks adjacent thereto, and he negligently failed to notify and warn the switching crew that he was going under said car on track No. 8, or between cars standing thereon which acts of failure to exercise ordinary care on the part of said John Henry Norton directly caused or contributed to cause his death."

The answer further contained a plea of assumption of the risk and of the dangers which Norton knew, or by the exercise of ordinary care could have known, from the switching operations. The reply was a general denial.

The chief claim made upon appeal is, that the demurrer to the evidence should have been sustained, and that the verdict is unsupported by the evidence. Additional thereto, are complaints of the giving and refusal of certain instructions. For the plaintiff, the case was submitted under plaintiff's Instruction 1, covering the case and authorizing a recovery. By that instruction, the plaintiff did not submit the question of constructive knowledge on the part of defendants that the deceased was in a place of danger; but, the instruction proceeded upon the theory that defendants' foreman and switch crew knew the deceased was at work about cars on track 8, where the movements of cars on that track would injure him, and that without warning him, they kicked cars onto that track, and against the cars about which he was working. Defendants insist there is no evidence the crew knew the deceased was in a position of peril, or evidence that they were under any duty to warn him.

Defendants' yards at Venice consist of seventeen tracks, running from north to south. The main track is upon the east. They are numbered consecutively, beginning with number 1 at the west side. These tracks converge at the north and south ends by a system of switches and leads, which finally connect them with the main track. The yards were used as a classification yard. Trains of freight cars would enter, and the trains were broken up by switching crews, and cars set on various tracks according to their destinations. Cars destined for the west side of the Mississippi River by way of the Terminal Railroad of St. Louis, and the Eads Bridge, were set on track 8. The method followed was for the switch crew to push a number of cars ahead of the switch engine, on the lead track, line up the switches for the track on which the head car or cars of the cut were to go, and then when the train was going fast enough, the cars destined for the track in question, were uncoupled, and allowed to run by momentum down the proper switch track, the brakes being applied to the rest of the train.

On the morning in question and prior to the events leading up to the death of Norton, four cars had been left standing on track 8. The northernmost of these was a loaded L. & N. car, and next a loaded C. & A. car. These were coupled together. South of the C. & A. car were two Frisco box cars, which were not coupled to the two cars first mentioned. At some time after ten o'clock of that morning, a train of about forty cars entered the yards from the north, spoken of as train 89. After the caboose had been taken away from that train, the cars in the train were inspected by Norton, and Fields, another car inspector. This was preliminary to the switching of the cars in the train to the various tracks. Fields, called by defendant, testified that they began the inspection at 10:40 A. M. and it took about twenty-five minutes. He said he went down the east side and Norton down the west side of the train; that after the inspection, which consisted of taking the car numbers, the initials of the cars and examining for defects and making a record, he went away to other matters, and the switching crew began the work of placing the cars upon the various tracks. When he last saw Norton, the latter was at the south end of the "old main track." It was the last four cars of train 89 which were kicked onto track 8, and ran against the four cars heretofore mentioned as already standing on that track. No one was called who followed the movements of Norton after the inspection of the cars in train 89. No one was called who observed him at or about the four cars standing on track 8. After the inspection of train 89 was completed, and not long after, the four cars from train 89 were kicked onto track 8. Norton was found dead on track 8, his body lying across the track and under the south part of the L. & N. car. Blood was found on the north trucks of the C. & A. car

and on the south truck of the L. & N. car. The cinders between the rails had been disturbed or torn up a little, for a distance of eight or ten feet, as if something had been dragged over them.

James Randall, called by plaintiff, testified that he carded train 89. This was done before Norton and Fields inspected that train. Randall testified that in carding the train he found that four of the cars of that train were to go over the Eads Bridge; that he went to where Norton, and Walker the foreman of the switch crew, were; that Walker and Norton were engaged in conversation. His testimony is to the effect that he told Walker of the four cars which were to go over the Eads Bridge, which, according to other testimony, would mean that they were to be switched over on to track 8. Randall testified that while he, Walker and Norton were together on the occasion mentioned, he heard Norton tell Walker that after he (Norton) got through inspecting the train (89) he was going to make a repair on track 8, and that Norton said to Walker: "Now, kid, watch out for me." Randall also, in his testimony, said that when "a car repairman has work on cars on certain tracks, he usually notifies the crew or at times he will set out blue flags to notify the crew, for his own safety, that he is working on that track so they won't kick a car over him." Walker denied that Norton made the statement testified to by Randall, and denied that Randall said anything to him about the four cars, part of train 89.

J. C. Nielson was the switchman who went ahead of the cars in train 89 in the switching movement made, and lined up the switches for the various tracks, including track 8. He was called by plaintiff and testified:

"Q. Now, was it customary for Mr. Norton to notify the foreman of the crew that he was going to do some light repair work on the tracks? A. Well, if he had any work to do on any of the tracks he would always notify some one of us.

"Q. Always notify the foreman? A. Always notify one of us.

"Q. And of course the foreman was the man in charge of the work? A. Yes, the foreman was in charge.

"Q. Now, if you had known, yourself, that Mr. Norton was down on track 8, of course you wouldn't have thrown that switch? A. Why, absolutely not.

"Q. Now, when it came to putting these four cars down on track 8, if you had known that somebody was working in there you would have placed them on some other track? A. Not necessarily.

"Q. What would you have done with them? A. We could have set there and waited.

"Q. But that would cost time, and the crew wouldn't be allowed to do a thing like that? A. Well, it would take a little time, depending on what the repairman was doing.

"Q. Isn't it customary, when you know a car inspector is working on one track, to hold the cars out from that track until he gets through? A. Depends on what kind of work he is doing.

"Q. While he is working there underneath and around the cars don't you hold them out, or do you kick them in there? A. I never seen them working underneath the cars on that track that long. Anything that would take something like that would be sent over to the rip track.

"Q. You have never seen them work for ten minutes, have you? A. Not that I can recall.

"Q. All right. But, anyhow, you would have had to put these four cars down some other track, and after Mr. Norton got through with his work on that track you would have to go back and get those four cars and put them back?

"MR. REEDER: The witness didn't say that. I object to it as misquoting his testimony, not being what the witness has stated.

"THE COURT: Objection sustained.

"MR. NOELL: Q. I will ask you what you would have done with those four cars? A. Put them down on another track if we knew that the inspector was going to be working there some time. If it was just a minute or two we would set there and wait.

"Q. You would hold them out, in other words? A. Hold them out on another track and put them down there with the rest of the bridges that might be in the train. Make it all in one movement later on when he had finished; that is the way I would do it, but I never known it to be done, because the inspectors don't work on those cars that long.

"Q. Then you would go and get all the rest of the bridges and put all the bridges, including these four, down on track 8? A. Yes, sir.

"Q. But on this occasion, in order to save time, they moved them over, kicked those four cars down there to get through with them, get them where they belonged? A. Well, we wasn't in any hurry."

Following this, on recross-examination, he testified:

"Q. You could have taken them down there with the engine? A. Why, sure, taken them down there and set them there without kicking them in, then we would be through with them.

"Q. There was plenty of room on track 8 to put them in there, wasn't there? A. Yes, sir.

"Q. It is customary with the car repair man, when he has some repair to make on a certain car, to take that car out and put it on some track for that particular purpose? A. Yes, sir.

"Q. And you always did that, too? A. Yes, sir; quite often.

"Q. That is, if repairs were needed on a car that had been put in on a live track, like 8 was, they would take that car out and put

it on one of the repair tracks? A. They would put it right on No. 1 lead, right in front of the shanty.

"Q. That is what they have those tracks there for, isn't it? A. Yes, sir.

"Q. You have certain car tracks that are known as the repair tracks, where those repairs are made? A. Yes, sir, the rip track.

"Q. And when a car is in need of repairs that requires a man to get underneath, it is carded and taken over on one of those tracks for that purpose, isn't it? A. Yes, sir.

"Q. Track No. 8 was a live track, and there was switching going on all the time from both ends, wasn't there? A. Yes, sir.

"Q. And it wasn't one of the tracks where a man could go under a car to make repairs? A. No, sir."

The evidence was that Norton's work as car inspector included also the duty and work of making light repairs—that is, such repairs as could be made quickly and conveniently on the track where the car was. Repairs of a more serious character and taking any considerable time, were made upon the rip track, to which the car would be removed for that purpose.

Plaintiff's witness, O'Neill, testified that the inspection to be made was of the entire car underneath and outside also, but that in the line of work in which Norton was engaged, "he would hardly be required to get underneath to make a repair."

The testimony was that a car inspector, such as was the deceased, would carry a chisel and hammer and perhaps nuts, screws, cotter keys, and "maybe a rubber gasket or two." Cotter keys were carried to be inserted, if necessary, in the knuckle joint of a draw bar, and a rubber gasket would be used on the air hose. It was the duty of the inspector to inspect the safety appliances of the car, and make repairs such as those already indicated, or the straightening or adjusting of any defective part, the supplying of a missing cotter pin, bolt, or like things, which could be done quickly.

Walker, the switch foreman, on his cross-examination, gave certain testimony somewhat similar in character to that given by plaintiff's witness Nielson, as to the inspector telling him when he was going to work on a certain track. This appears in the following:

"Q. And Mr. Norton was in the habit and so was Mr. Fields, of telling you when they had some work to be done on a certain track, that they were going to be at a certain place, and to watch out for them? A. Not exactly those terms; no sir, but similar to that."

The witness O'Neill was assistant car foreman, and after the death of Norton examined the four cars which were standing on track 8 before the switching movement was made. He discovered that a cotter key was missing from the brake beam at the west side on one of the Frisco cars, and it was in the line of Norton's work to replace

the cotter key if he discovered it was out. He also found a new cotter key in the C. & A. car. He said there was no wear on this key. The injury and death of Norton occurred on October 3rd. Defendant introduced evidence tending to show that a new cotter key had been placed in the C. & A. car on September 29th, putting in evidence a card report, said to have been made at the time, and showing a cotter key put in the C. & A. car at Joliet, Illinois, on September 29th. A witness for defendant testified he examined the cotter key in question on the day following Norton's death and that it had the appearance of having been in for some days prior thereto.

J. E. Byrns, general yardmaster at Venice, was called by defendants. On his cross-examination he was asked concerning the method or practice of switching when a car repairer was known to be working upon track 8, as follows:

"Q. Now, if you had one going to 12, two to 14 and four to 8, and somebody was working down on 8 in the way of a car repairer, what would be the duty of the crew switching the four cars as to the switching of them? A. What do you mean? If we knew there was somebody in there?

"Q. Yes. A. If we knew there was somebody working on cars on No. 8 we wouldn't kick them in there.

"Q. What would you do with them? A. Set them aside on some other track.

"Q. In other words, you would have to set them aside on some other track, and later on go back in there and make a move down onto that track, get them again and put them on 8? A. Yes, sir."

Farther on appears the following in response to a question by counsel for defendants:

"Q. And the crew could set it down there, too? A. Oh, yes, they could shove it down and set it, stop it perfectly still and never touch another car."

The testimony is to the effect that at the time the four cars were disconnected from the engine and allowed to run by momentum upon track 8 to the four standing cars, the switchman and the disconnected cars were about ten or twelve car-lengths from the four standing cars. The switchman who threw the switch said he could see the standing cars, but did not see Norton. The testimony of the witnesses, those for plaintiff as well as for defendants, is to the effect that track 8 was what is known as a "live track," and switching operations went on at both ends of it. Norton had been in the employ of defendant for about eleven years, and, it must be assumed, was familiar with the switching operations carried on in the yard.

Counsel for defendants insist that the evidence fails to establish any duty to warn the deceased, urging that since track 8 was a live track, the switching crew had a right to expect a clear track, and

was under no obligation to use ordinary care to ascertain if he was in a perilous position. It is argued that to say Norton was at work about the standing cars, would be mere conjecture; and that it is just as reasonable to infer that he was on his way to lunch or to the office. Urging that there is no evidence of actual knowledge by the switching crew that Norton was at work about the standing cars, counsel say there could be no duty to warn; and, that in any event, there is no evidence to show that any warning given would have been effectual.

The case being one in which liability is predicated upon the terms of the Federal Employers' Liability Act, the decisions of the Federal courts are to be followed by this court. [Pryor v. Williams, 254 U. S. 43; Laughlin v. Missouri Pacific Ry., 297 Mo. 845; Hoch v. Railway, 315 Mo. 1. c. 1208, 1209.]

Cases dealing with the questions of liability of the employer for injuries sustained by the employee, where the latter is engaged in work on or upon railroad tracks subject to switching operations or passing trains—the risk assumed by the employee and the obligation of the employer—are cited in the brief for defendant: Aerkfetz v. Humphreys, 145 U. S. 1. c. 420; Toledo, St. Louis & W. Ry. Co. v. Allen, 276 U. S. 167; Davis v. Railway Co., 276 Fed. 189, and others; also Hoch v. Railway, 315 Mo. 1199. The cases mentioned establish the rule that under the circumstances mentioned, the employee assumes the ordinary risks of his employment, and when obvious and fully known and appreciated, the extraordinary risks and those due to the negligence of his employer and fellow-employees. But, in the cases mentioned it is recognized that where the employee is exposed to some unusual danger by reason of a departure from the practice generally followed, a duty to warn may arise. [Toledo, L. & W. Ry. Co. v. Allen, supra.]

In that case the deceased was checking cars in the nighttime, on a track near to another track, and was struck by a train moving on the other track. The court held that under the evidence it could not be assumed that the deceased was not familiar with the switching practice followed in that yard, and also that there was nothing to show that the movement of the train which struck him created an unusual hazard. The court said, 1. c. 171:

"On the evidence it must be held that he knew how switching was done there; and, in the absence of proof that he was exposed to some unusual danger by reason of a departure from the practice generally followed, it cannot be held that defendant was in duty bound to give him warning. The members of the switching crew had a right to believe that he would keep out of the way of the shunted car."

926

It was held that the deceased assumed the risk because he was familiar with the yard, and knew cars were liable to be shunted without warning to him. There is enough testimony in this record to distinguish this case from that case. Here, there is evidence of a practice of deceased and other car inspectors to inform the foreman or some member of the switching crew, when they were about to work on or near cars on a certain track; and, there is testimony that upon the occasion in question, Norton informed the foreman he would make a repair on track 8, when the inspection of the cars in train 89 was completed.

Counsel for defendants argue that Randall's testimony should be rejected. They say his testimony as to what the deceased told Walker is so "improbable, contradictory, unusual and unbelievable" that it should not be given any credence. It is true that there is contradiction of Randall's statement, but we are not warranted in holding that his testimony is to be wholly disregarded. His testimony went in without objection. The defendants themselves, by their answer, alleged that Norton negligently went under the car or crossed track 8 between the cars thereon, when he knew or could have known other cars were being switched upon that track, and, that he negligently failed to warn the switching crew that he was going under said car or between the cars, on that track. Randall's testimony is a contradiction of that plea, and is to the effect that Norton did warn the foreman that he would do work on track 8. It cannot be said that Randall's statement is so improbable and unusual that it must be rejected, when it is considered that there is other testimony that Norton and the other inspectors did follow the practice of telling the foreman or some member of the switching crew that they were going to work on certain tracks. If it was the practice of deceased and others to so notify the foreman or members of the crew, a statement of the deceased himself to that effect, could not have been regarded as unusual; hence the testimony of Randall that deceased made the statement is not to be regarded as wholly unbelievable.

Plaintiff does not plead a custom, nor is the case founded upon violation of a custom or rule of practice, but the practice, if such there was, and the notice given thereunder, if such there was, were evidentiary facts pertinent to the questions, whether defendants were guilty of negligence in kicking the car on track 8, without warning, whether Norton was guilty of contributory negligence in working about the cars on that track, without warning the crew, and whether he assumed the risk of doing so. [Woodward v. Mo. Pac. Ry., 316 Mo. 1196.]

It is insisted there is no evidence of actual knowledge on the part of the switching crew that Norton was about the cars standing on track 8. It is true there is no testimony that any of the crew actually saw Norton about those cars, but actual knowledge may be shown by facts and circumstances.

"Where there is a duty to use diligence, those facts which diligence will discover are presumed to be known under the law of notice; and what one knows and what he ought to know is regarded in law as equivalent." [Dutcher v. Railroad, 241 Mo. l. c. 165; Rine v. Railroad, 100 Mo. 235; Lynch v. Railroad, 208 Mo. l. c. 21; Kame v. Railroad, 254 Mo. l. c. 196; Rittenhouse v. St. Louis-S. F. Railroad, 299 Mo. 209.]

Under the circumstances shown in evidence, it cannot be said conclusively that the foreman of the switching crew had a right to expect a clear track on track 8. Under the evidence the switching of the cars in train 89 was to be done as soon as the inspection made by deceased and Fields was completed—a work taking about twenty-five minutes; and, also, on completion of that inspection, the next work of the deceased was to be on track 8; the next work of the crew was to be the switching of the cars of train 89. Four of those cars were to go on track 8. The testimony of Randall is that the fact that the four cars were to go on track 8 was mentioned on the occasion of the conversation between Walker and Norton.

It is the testimony of the defendant's witness Byrns, general yard master, that if they knew there was somebody working on cars on track 8, they "wouldn't kick the cars in there," but would set them aside for a time. While Norton, the deceased, in the character of work he was doing would be held to have assumed the risk arising from the negligence of the switching crew, if the risk was open, obvious and appreciated by him, yet it cannot be said that he assumed the risk arising from an act of negligence on the part of the crew, unknown, not anticipated, nor reasonably to be anticipated. [Montgomery v. Baltimore & Ohio Railroad, 22 Fed. (2d) 360; Chicago, Rock Island & Pacific Railway Co. v. Ward, 252 U. S. 21.]

According to the testimony, the statement of Norton to Walker was made when Norton, in the course of his duty, was about to go to the line of cars, immediately to be inspected by him, and then to be switched on to the various tracks under the direction of Walker in the discharge of his duty. According to Norton's statement, the inspection of the cars in train 89 by him, was to be followed by his work upon track 8. Under the evidence as to a practice to notify the switching crew, when the inspector was going to work on a certain track, his statement was one pursuant to that practice, and was in effect a notice or warning as to what he intended to do. It is also to be considered

as related to the question of whether Norton went to the standing cars, in the discharge of his duty or, as defendants suggest, was on his way to lunch, or on some other errand. It was not a statement having reference to an act past, but referred to two related acts, to follow in due course, his own act of going on track 8, and the switching of cars on that track, and was so intimately connected with the main fact under investigation as to be a part of it. [Haines v. Chicago, Rock Island & Pacific Ry., 193 Mo. App. 453, and cases there cited.] It should not be overlooked either that upon the trial defendants made no objection whatever to this testimony; and also, that in their answer setting up contributory negligence, they alleged Norton went underneath the car in question or crossed the track between the cars thereon, without warning the crew that he was going to be upon that track.

Under the evidence in the record we conclude that the question whether the switch foreman was to be charged with knowledge that Norton was employed about the cars standing on track 8, when the other cars were kicked onto that track, was one for the jury. From all the evidence in the case and the circumstances shown it could reasonably be inferred that the foreman of the switch crew knew that Norton was employed about the cars on track 8, and in a place of danger if other cars were kicked against the standing cars; and that the kicking of the cars upon that track under the circumstances shown, without warning, or the taking of any precautions for the safety of Norton, was a negligent act not reasonably to have been anticipated by him.

The defendants offered their withdrawal instructions C and D, respectively withdrawing the two specifications of negligence pleaded in the petition. Instruction C would have withdrawn the assignment that defendants negligently caused the cars to be kicked by an engine against the cars about which Norton was working, when they knew or could have known that he was employed about the cut of cars standing on that track. Under the conclusions heretofore stated, that instruction was properly refused.

Instruction D would have withdrawn the charge of negligence in causing cars to be kicked against the cars about which Norton was employed without warning him that those cars were about to be kicked against the standing cars. This instruction was also properly refused.

Defendants complain of the modification of defendant's Instruction 6 as offered. The instruction, as offered, was on the theory that if Norton was familiar with the way switching was done and went under or between the cars, he assumed the risk of injury and plaintiff could not recover. As modified it told the jury that if he went under or between the cars and the

foreman or members of the switching crew had not been informed that deceased was working on or about the cars standing on track 8, then he assumed the risk of injury, and the plaintiff was not entitled to recover. The essential objection to this modification is that it takes into consideration the testimony of Randall, which defendants insist is unbelievable and ought to be rejected. We do not think the modification constituted error.

Complaint is made of plaintiff's Instruction 1. It is insisted that it is confusing and misleading because it is too long and unnecessarily submits numerous conceded facts. The instruction is lengthy, but we cannot say that it was misleading, or that the jury could not have understood it. The instruction cannot be held erroneous upon this ground. [Wolfe v. Payne, 294 Mo. 170; Henry v. Illinois Central Ry. Co., 282 S. W. 423, 424.]

The other objection to the instruction is based upon the contention that it is unsupported by any evidence and that a finding thereunder would be wholly upon conjecture. Under what we have heretofore said we overrule that contention also.

There is no contention that the verdict, which was for $9,000, is excessive, and the judgment is affirmed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.