BURNS W. FREEMAN v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—107 S. W. (2d) 36.

Division One, June 30, 1937.

---

*NOTE: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing filed; motion overruled at May Term, 1937, June 30, 1937.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

290

*Wm. H. Allen* for respondent.

BRADLEY, C.—Action for personal injury under the Federal Employers' Liability Act. 45 U. S. C. A., Section 51 et seq. The jury returned a verdict in favor of plaintiff for $17,500. Pending motion for new trial, a *remittitur* of $5000 was filed; and the motion was overruled. This appeal followed.

Plaintiff was a member of a switching crew and on January 11, 1934, about one-fifty-five A. M., was injured in defendant's CD yards in East St. Louis, Illinois. Plaintiff went to the jury on the charge of negligence that the engineer kicked a car over a switch where plaintiff was working without a come ahead signal from plaintiff. The answer was a general denial and assumption of risk. That the cause is one properly under the Federal Employers' Liability Act is not disputed.

Error is assigned (1) on the refusal of a demurrer to the evidence; (2) on plaintiff's Instruction No. 1; and (3) that the verdict is still excessive.

Plaintiff had been working in these yards since December, 1922, and on the night of his injury he was switch tender. Other members of the crew working with plaintiff were Conklin, foreman; Rule, pin puller; Schatz, engineer; and Jones, fireman. The lead track involved extended north and south. From north to south along the lead track, switches went off on the west side, and these switches were numbered from north to south. Plaintiff was injured at switch No. 16, the stand for which, was about 3 feet east of the east rail of the lead track, and rested on extending switch ties. The stand was low and was called a "ground switch. stand." The switch was operated by a lever which was pushed over, north or south, according to the lineup desired. This lever had an iron ball on its end, which ball weighed thirty-five or forty pounds, and if the switch was to function properly this ball should go down to the ground, or to a wood block upon which the ball came to rest when all was well. If the lever was thrown or turned over from the north to the south, then a car coming on the lead track from the north would take switch No. 16. If the lever was thrown from the south to the north, then such car would continue south on the lead track. The engine, on the lead track, was headed south and was some distance north of switch No. 16. In front of the engine were three cars. The two cars next to the engine were high and obstructed the reflection of the headlight down the track. The south car of the 3 was a 3-board coal car, and this car was to be placed on switch track No. 16. Switch No. 16 was then so lined that a car coming on the lead from the north would continue over the switch and on south on the lead track, hence it was necessary to throw the switch lever from the north to the south, so that the coal car would take switch track No. 16. With the engine and 3 cars in front moving south towards

switch No. 16, plaintiff attempted to throw the lever from the north to the south, but "it wouldn't go over," and as to what followed plaintiff testified:

"Then I knew there was something the matter and I had to see what it was and I gave the foreman a stop signal. . . . I knew something had dropped down to lock the switch, which would prevent the points coming back to the rail, you see. He (the foreman) relayed the stop signal to the engineer and when I looked up then to see if the cars were stopped, and from the light on the north hump shanty, that light was shining right down on the car; I could see the car there from under that light. Then I seen that the cars were stopped. Then I walked over there between that fifteen and sixteen switch and cleaned that point out. When I had opened it up *there was coal piled up in there in the switch between the lead and the switch; the coal run down into the switch point.* (Italics ours.) Then when I got that cleaned out, I walked over to the outside of the lead and cleaned that coal out so the switch point would come up against the lead and would be open to track 16. Then I throwed the ball of the switch up over here and pressed the ball of the switch down with the left foot and just had raised my left foot back off of the ball of the switch—a few inches from the ball of the switch and turned my body in a northern direction where I was going to give a signal for the car to come down the switch on 16 and all at once the ball come up and struck my foot and I staggered in the direction of the car of coal coming over—it was the ball holding the switch point which come up and struck my foot—the car was coming over the switch point at the time. . . . Well, as I said, just about the time I raised my foot off of the ball of the switch and turned my body northwardly in the direction where I was to signal to the crew for the car to be kicked down on lead track (switch track) 16, suddenly the ball of the switch raised up and struck my left foot and caused me to stumble north in the direction the car was coming from." The result was that plaintiff fell and his left arm was cut off about five inches below the elbow.

On cross-examination plaintiff testified that when he threw the switch he was facing west. "Q. Facing west. Now, as I understood you, when you got your foot just back or off of the switch ball—the lever ball, why, then the front trucks of that coal car were going over the switch points there? A. Just about the time I raised my left foot off of the ball of the switch and I just had turned my foot this way—see? Right that way, that is the shape I was in (indicating). Just about that time, the first part of the trucks of the car of coal hit them points and raised that ball up and (I) stumbled right that way into the direction the car was coming. Q. That was just at that time? A. That was just at that time. Q.

That was when the wheels of the car first struck the switch points? A. When the wheels of the car just struck the first—struck the switch points, that raised the ball of the switch up right quick. Q. That was the south wheel of that coal car? A. The coal car was going south and it was the first pair of trucks down that way. Q. The first pair of trucks down that way. How far did they push you? A. Just pushed me right over that way; I judge just a short way. Maybe six or seven feet, before I fell out that way. Q. Six or seven feet north of switch 16? A. Yes, sir."

Plaintiff testified that "if you give a stop signal, they are to stand there until you give a come ahead signal;" that he did not give a come ahead signal. "When you give them a stop signal, they stop and they always wait until you give them a come ahead signal again, and then they tap the bell for you, so if there is anybody around, why, they get out of the way." Plaintiff testified that the bell was not rung before the engine was started after it had stopped on his signal to his foreman. Rule 30, which was introduced, reads: "The engine bell must be rung when the engine is about to move, while approaching or passing a public crossing, or cars, or stations; through tunnels and when approaching points where workmen are engaged."

William H. Breeze, plaintiff's witness, testified that he was in railroad work for thirty-six years, switchman, foreman and yardmaster; that he last worked for the defendant; that the reason why he was not still railroading, was that "there ain't no business;" that he was familiar with the ground switch; that some roads have used the ground switch "for the last 36 years;" that he had used the ground switch and had had experience "with foreign substances getting in switch points. Q. Have you ever noticed how they act when cars go over them? A. Well, if there is anything in your switch points, why, you can't get them down tight. They might not be right in the point direct, but even if it is back near the hind end of the point, it would have a tendency to throw that bar up." On cross-examination: "Q. . . . Now whether or not there are any small particles of coal remained in there, if it was—if he turned the switch clear over as far as it would go, why, then the switch points would be up against the rail, wouldn't they? A. It may be right up at the end, but if there is any coal at the back, it would have a tendency to press that end and throw that lever back up again." Then on redirect: "Q. Just what kind of a task is it to clean coal out of switch points to be sure that you get it all out? A. If it is back in there toward the back, it is pretty hard to get it out at times."

Defendant's evidence: Schatz, the engineer, testified that cars were kicked down the lead track on "signals from the foreman;" that

he got signals from the foreman to kick all of these cars;" that it was "a little misty" the night plaintiff was injured; that he could not see from where he was "as far down as switch 16 that night;" that after the accident he examined the switch and that "It was lined for 16 where the car went;" that he worked the switch and that it was "all right;" that he had never seen one of these ground switches fly back. "Q. Did you see any coal around there? A. There might have been a little pulverized coal laying around there. If there had been any coal in there, why, the way the car come against that switch point would have pulverized it— would have crushed it."

Rule, pin puller, testified that at time of accident he was standing "on the front end of the engine;" that he did not see the accident, but was at switch No. 16 shortly thereafter; that the switch was lined for switch track 16 and that the coal car that caused plaintiff's injury was "about eight or nine car lengths" from the switch and on switch track No. 16. Jones, the fireman, said that the switch was lined for switch track 16. Conklin, the foreman, was away and was not a witness.

B. B. Hickman, defendant's superintendent, testified that he had been a switchman and yardmaster. "Q. Supposing after the wheels hit track 16 and the lever flew up—after it was turned south so it would go into track 16 and it flew up, why, what would happen? A. The car after it—depend on how much it flew up. The car would either go down the lead part of it or be derailed. . . . Q. Now, when that track is set for 16—the switch is set for 16 so the car would go down track 16, and the wheels hit the switch point to go down track 16 and that is where the car goes down track 16, then would that lever fly up? A. No. Q. That is, when it is set for south, then it can't fly up? A. No, not with the car on it. Q. Not with the car on it? A. The car bearing against the switch points would force the lever down, if it did anything. Q. Force the lever down? A. Yes; that would be where the force is exerted. Q. And when the wheels hit the switch points, then that would force the lever down and keep the lever down instead of it coming back, would it? A. Yes, sir. . . . Q. Supposing there were little particles of coal in the switch points, would that make any difference. A. No. Small particles of coal wouldn't make any difference. Q. It would only be large lumps of coal that would make a difference, wouldn't it? A. Yes, sir."

W. H. Horner, defendant's track supervisor, testified that he learned about plaintiff's injury about eight-thirty on the morning of January 11th, and then went to switch No. 16; that he did not find any coal "in the switch points," but did find "probably a wheelbarrow load" scattered "from the point of the switch to the

heel of the switch on the ground. . . . Q. Now, supposing after the switch lever was down fully to the south and a train come along and the wheel of the car struck the switch point of switch track 16 as it was flush against the rail of the lead track, what would happen to that lever, if anything? A. There wouldn't anything happen to it; not if it was down. Q. Not if it was down? A. No.? Q. Nothing would happen to it? A. No.? Q. Would it fly back? A. No, sir. Q. What would be the effect of the wheel pressing against the rail of the switch point and track 16 under those circumstances? A. It wouldn't practically have any effect on the lever of the switch, because the lever is in neutral position when it is all the way down.''

M. O. Edmonson, defendant's assistant yardmaster, and on duty the night plaintiff was injured, testified that he and foreman Conklin were together at the time; that he went to the hospital that night with plaintiff and that plaintiff said that ''something hit him, that he didn't see what it was;'' that ''between half past two and three'' o'clock that morning he, witness, went to switch No. 16 and found a few lumps of coal ''around the end of the points there and in the middle of the track. .· . . Q. So, in your opinion, when the track is lined for 16 and a car going south, under those same circumstances as you have them here, will that lever fly from the south to the north? A. I don't think so; I never saw one do it. Q. You never saw one do it? A. No, sir. Q. And I guess you have seen many cars go over switches under those circumstances? A. Well, I have saw a good many. Q. How long have you been there in the yards? A. 14 years.''

On the assignment based on the refusal of the demurrer to the evidence defendant makes three contentions, viz.: (1) That according to plaintiff's case, his injury resulted from that which defendant, in reasonable diligence, could not have foreseen or anticipated; (2) that kicking the coal car down the leadtrack ''without waiting for a signal from plaintiff to move it, even though this was negligence, was not the proximate cause of plaintiff's injuries;'' and (3) that since the kicked coal car concededly went in on switch track No. 16, ''it was impossible for the accident to have happened as stated by plaintiff.'' Plaintiff did not predicate negligence upon an obstructed switch or a defective switch.stand, but upon the alleged negligent kicking of the coal car before plaintiff had completed his work at the switch and ''without a come ahead signal from the plaintiff.'' If the coal car was kicked down the leadtrack without a come ahead signal from plaintiff, and contrary to the established custom and practice, then such act constituted negligence. Plaintiff's experience with the switch lever and the ball was the incidental thing that happened to intervene and place him where he was injured, because of the negligent kicking of the coal car before he had given the

come ahead signal. The situation, as we see it, would have been no different, so far as concerns the question of negligence, had plaintiff been injured while he was removing the coal, after first attempting to throw the switch and found that the lever would not go entirely over to the south. We do not find any support for defendant's first and second contentions respecting the demurrer to the evidence. "The liability of a person charged with negligence does not depend on the question whether, with the exercise of reasonable prudence, he could or ought to have foreseen the very injury complained of; but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission." [Dean v. K. C., St. L. & Chicago Railroad Co., 199 Mo. 386, l. c. 411, 97 S. W. 410; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S. W. (2d) 122; Washburn v. Laclede Gas Light Co., 202 Mo. App. 102, 214 S. W. 410, Id., 284 Mo. 181, 223 S. W. 725.]

It is the general rule that switchmen and other employees working in and about railroad yards or cars or engines "moving or about to be moved" are under the duty to look out for themselves "in the absence of a rule, custom or assurance requiring a warning, when going around, on or near tracks, engines or cars." [Goodwin v. Mo. Pac. Railroad Co., 335 Mo. 398, 72 S. W. (2d) 988, l. c. 991, and cases there cited.] But in the present case there was substantial evidence, and nothing to the contrary, that in the switch work being done when plaintiff was injured, the engine was not to move down the lead track in kicking these cars, except on signal from plaintiff. The situation is stronger than if plaintiff had had an assurance that this coal car would not be kicked until he was in a place of safety. [See, also, Norton v. Wheelock et al., 323 Mo. 913, 23 S. W. (2d) 142, l. c. 148 (9, 10); Kamer v. M.-K.-T. Railroad Co., 326 Mo. 792, 32 S. W. (2d) 1075; Mitchell v. Wabash Railroad Co. et al., 334 Mo. 926, 69 S. W. (2d) 286, l. c. 292 (8).]

We think the question of proximate cause and defendant's negligence were clearly for the jury.

Defendant says that it is impossible for plaintiff to have been injured in the manner described by him, and this because, as defendant contends and as stated, the kicked coal car went down switch track No. 16, therefore, it is claimed, the switch lever and ball *could not* have risen as claimed by plaintiff. It is true that a court "may properly reject evidence which is contrary to physical facts or to known physical laws or which is the result of evident mistake, or, in short, when the evidence itself, or other established facts, discloses its inherent infirmity." [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079, l. c. 1082, and cases there cited; Hardin v. Ill. Cent. Railroad Co., 334 Mo. 1169, 70 S. W. (2d)

1075, l. c. 1079; Vitale v. Duerbeck, 338 Mo. 556, 92 S. W. (2d) 691; Doyle v. St. Louis Merchants' Bridge Terminal Ry. Co., 326 Mo. 425, 31 S. W. (2d) 1010, l. c. 1012.] However, under the facts of the present case we cannot say as a matter of law that plaintiff's fall and injury did not occur as he testified.

It is contended that plaintiff's Instruction No. 1 is erroneous because it does not require a finding that the moving of the coal car against the switch point caused the lever to fly up, and that the instruction fails to require a finding that the car came in contact with the switch point. Able counsel cite no authority to support the assignment on this instruction. The instruction, among other things, required a finding that the cars were kicked "towards the switch points" without a come ahead signal, and that "the ball of said switch struck plaintiff, causing him to fall," etc. According to plaintiff's evidence the switch lever did fly up, and there is no dispute as to the coal car arriving at and passing over the switch. We do not believe that there is merit in the complaint on Instruction No. 1.

Is the verdict excessive? The verdict was for $17,500, and a *remittitur* of $5000 was made, leaving $12,500. Plaintiff was forty-six years old at time of injury, January 11, 1934. His expectancy was approximately twenty-four years. He was earning from $180 to $190 per month, or from $2160 to $2280 per year. The trial commenced March 5, 1935; and he testified that he had not earned anything since his injury. The injury is permanent, and he said that he still suffered pain in his arm. "Well, it pains me and keeps me nervous." The oft repeated rule is that appellate courts should not disturb a verdict for damages on the theory that it is excessive, unless it is apparent from the record that the verdict is grossly excessive. [Plater v. Kansas City, 334 Mo. 842, 68 S. W. (2d) 800.] The trial court approved the verdict after the *remittitur*. We are not persuaded that we should hold the verdict still excessive. [See Radler v. St. L.-S. F. Ry. Co., 330 Mo. 968, 51 S. W. (2d) 1011.]

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.