SUTTON

v.

CITY OF ST. JOSEPH et al.

No. 21931.

Kansas City Court of Appeals.

Missouri.

Jan. 11, 1954.

Whitney W. Potter, Francis A. Pickle and Richard S. Duncan, St. Joseph, for appellant.

Leonard Johnson, St. Joseph, and Trusty, Pugh & Green, Kansas City, for respondent Sutton.

Boyd & Elliott, St. Joseph, for respondent Emil O. Schultz.

Joseph M. Garvey, St. Joseph, for respondent John Wyeth.

John Mitchell, Price Shoemaker and Elmer E. Reital, St. Joseph, for respondent Cash Whitman.

CAVE, Presiding Judge.

This is a suit for damages for personal injuries suffered by the plaintiff. The court sustained defendant Schultz' motion to dismiss plaintiff's second amended petition because it did not state a cause of action against said defendant; at the close of plaintiff's evidence, the court directed a verdict in favor of defendants Wyeth and Whitman; and at the conclusion of all the evidence, the jury returned a verdict against the city for $6500, and from the judgment entered thereon the city appeals.

The city raises three points: (1) that the court erred in overruling its motion for a directed verdict at the close of all the evidence; (2) that the court erred in sustaining the pretrial motion of defendant Schultz to dismiss plaintiff's amended petition, and in sustaining motions for a directed verdict of defendants' Wyeth and Whitman; (3) that the verdict is excessive.

Plaintiff's petition alleged in substance that Schultz, a plumber, Wyeth, a property owner, and Whitman, a contractor, made an agreement for the purpose of completing the construction of a home Wyeth was building, whereby Schultz, a master plumber, was to procure in Schultz' name a permit from the City of St. Joseph to open Frederick Avenue at a certain point for the purpose of making sewer, water and gas connections leading to the Wyeth home; that Schultz applied to the city for the permit and executed a plumber's bond as required by a certain city ordinance; that Whitman (and not Schultz) actually made the excavation in carrying out the work for Wyeth, although neither he nor Wyeth had a legal permit to do so; that said permit authorized only Schultz to make said excavation in the street, and by a general ordinance of the city no person was permitted to make any such plumber's excavation in the streets of the city without obtaining a permit from the city so to do; that the application for such a permit must be signed by the person to do the work and that the permit is not assignable; that the agreement between Schultz, Wyeth and Whitman was made for the purpose of

securing a permit and evading the provisions of certain ordinances, which were set out in the petition; and that Schultz procured the permit in his name for the purpose of it being used by Whitman and Wyeth. That while plaintiff was riding as a guest in a car driven by one Samuel Waggoner east on Frederick Avenue in St. Joseph, and while passing another east bound car, and while moving along south of the center line of Frederick Avenue, a third car, operated by a Mrs. Bratcher, which was being driven westward along Frederick Avenue, struck an unlighted barricade placed over said excavation, and was thereby thrown out of control and caused to come to the left or the south side of Frederick Avenue and collide with the automobile in which plaintiff was riding, causing his injuries; that Schultz, Whitman and Wyeth had unlawfully secured the permit to make such excavation and had negligently failed to put a warning light on the barricade, and that the City of St. Joseph had negligently failed to put a warning light on the barricade as required by certain ordinances.

The city's answer admitted certain formal allegations of the petition and the correctness of certain pleaded ordinances, but denied all other material allegations. As an affirmative defense the city alleged that the sole cause of the collision was the negligence of Waggoner, the driver of the car in which the plaintiff was riding, in operating the same on the wrong side of the center line of Frederick Avenue and in driving at a high, unlawful and excessive speed, all in violation of certain pleaded ordinances. At the beginning of the trial the city amended its answer by alleging that Mrs. Bratcher "negligently failed to operate her westbound LaSalle automobile as close to the north curb and her right hand side of Frederick Avenue as practicable in violation of said laws, thus and thereby directly and solely causing plaintiff's injuries, * * *."

Defendant Whitman answered admitting certain formal allegations and denying all other material allegations of the petition, and plead contributory negligence in certain

respects on behalf of the plaintiff, and also alleged that on and prior to May 10, 1950, the date of the collision, the city had elected to refill and repave the excavation in the street as authorized by certain ordinances and that on the day of and prior to the collision the city had refilled and repaved said excavation with concrete and had assumed the responsibility for erecting the barricades and proper warnings of such condition, and that he was not liable for the negligence of said city in failing so to do.

Defendant Wyeth answered admitting certain formal allegations and denying all other material allegations.

■ The transcript contains 600 pages of testimony and exhibits. We shall first dispose of the city's contention that its motion for a directed verdict at the close of all the evidence should have been sustained. This requires a statement of the evidence in the light most favorable to plaintiff.

■ Able counsel for the plaintiff and the city, with commendable frankness, have limited the field of inquiry to the question whether the Ford car, in which plaintiff was riding, was driven to its left or to the north of the center line of Frederick Avenue and thereby caused the collision, or whether the LaSalle car, being driven by Mrs. Bratcher, struck the unlighted barricade and swerved to its left or to the south side of the center line and caused the collision. The city argues that the overwhelming weight of the evidence supports its contention that the Ford was north of the center line immediately before and at the time of the collision. This court cannot weigh the evidence or determine in whose favor the evidence preponderates. The issue now under consideration presents the question whether there was substantial evidence to support plaintiff's contention that the LaSalle was driven to its left or the south side of the center line and thereby caused the collision.

It is undisputed that Frederick Avenue is an east and west street with four lanes of traffic, two on the north side and two

on the south side of a well defined center line, and that each lane of traffic is approximately ten feet wide; that several weeks before the date of the collision there had been made an excavation in the street just north of the center line for the purpose of making sewer, water and gas connections leading to a private home; that this excavation was made by defendant Whitman; that he filled the excavation with dirt and gravel level with the surface of the street, as he was required to do by city ordinance; that thereafter the city elected, as it may do by a certain city ordinance, to complete the repair of the street by removing a certain amount of the dirt and filling such excavation with concrete; that the collision occurred about eight p. m. May 10, 1950; that on that day the city had removed a certain amount of the dirt and gravel from the excavation and filled the same in with concrete level with the surface of the street and erected a barrier which was made of two by fours attached to iron footings; and that the city did not put out a red light or flare or any similar warning as it was required to do.

Plaintiff's witness, Mrs. Nelson, testified that on May 10, 1950, the date of the collision, she lived in Chillicothe, Missouri; that in the late afternoon of that date, she drove, with Mr. and Mrs. Stevens, to St. Joseph, and arrived there between seven and seven thirty p. m.; that they drove westward along Frederick Avenue and passed the barricade at the scene of the accident and there were no lights; that they passed on the north side thereof; that they drove on uptown and let Mr. Stevens out at a union meeting and she and Mrs. Stevens started back to Chillicothe; Mrs. Stevens was driving; that they stopped for a stop sign at Noyes Boulevard and the motor died and a car behind them pushed their car along until it started; that this was the same Ford that was involved in the collision; that they drove along in the south lane and near the south curb of Frederick Avenue at about fifteen miles per hour; that the Ford followed along behind them until they were about one block from the place of the accident when the Ford turned into the inside south lane but still to its right or to the south of the center line, and started to pass their car at about twenty-five or thirty miles per hour; that she saw the LaSalle car coming west and that when the Ford had just passed them, she saw the LaSalle hit the barricade on the north side of the center line and "jump out in front of the Ford * * * over into the south inside lane"; that the Ford then turned or was knocked toward the southeast and immediately in front of their car, which collided with the right side of the Ford before they could stop; that the LaSalle stopped so that part of it was "over in the south center lane and part was over the hole". She was permitted to testify without objection that one of the policemen, who was directing traffic after the accident, made the statement that the Ford must have been going eighty miles an hour and that she told him it could not have been going more than twenty-five or thirty miles per hour, and he told her not to make such a statement; and that he told Mrs. Stevens not to make the statement that she saw the Ford "in her rear vision mirror" as they approached the point of collision. On cross examination, the witness identified a written statement she had given a Mr. Flynn, who interviewed her on behalf of the city, and her attention was directed to this language in the statement: "The other two cars hit just about the center of the street. It would be the middle lane if the street is three lanes". She testified that she did not realize, at the time she signed the statement, that it referred to a three lane highway. Her attention was also directed to the following language in the statement: "I did not notice either car do any maneuvering before the accident, except the car behind us." She admitted that language was in the statement, but testified she did not know Mr. Flynn at the time he interviewed her and she did not feel she should tell him everything that went on. At most, these two statements would affect her credibility as a witness, but certainly would not destroy her testimony given at the trial.

Mrs. Stevens testified that after the Ford gave them a push, at Noyes Boulevard, she drove at about fifteen miles per hour and close to the south curb of Frederick Avenue; that the Ford was passing them at the time of the collision, but that she did not notice the LaSalle until the collision; that the Ford was not going much faster than her car.

Waggoner, the driver of the Ford, testified that plaintiff was riding in the front seat with him, and that when they reached Noyes Boulevard, the Stevens car had stalled and he pushed it along until it started; that he followed along behind the Stevens car for some distance and then when about a block and a half from the place of collision, he turned into the inside south lane and undertook to pass the Ford; it was travelling about fifteen miles per hour and his speed was twenty to twenty-five miles per hour; that the Stevens car was in the south lane and near the south curb; that no part of his car was at any time north of the center line of Frederick Avenue; that he was rendered unconscious by the collision but that as near as he could remember he had just passed the Stevens car and noticed another car coming from the east; that he heard that car collide with something and then its lights were in his eyes and it collided with his car. The city sought to impeach this witness by showing that when his deposition was taken in August, 1951, he was asked whether he was married and stated that he was, when in truth he had been divorced in December, 1950. In explanation of this, the witness stated that when the question was asked at the time of the taking of his deposition, he thought it meant whether he was married at the time of the accident, "that is when all of the rest of the questions are about". The effect of this impeachment was a question for the jury, not for this court.

The testimony of plaintiff Sutton was substantially the same as the other witnesses with reference to the occurrence at Noyes Boulevard, and the rate of speed of the cars from that point to the place of collision; and that they were passing the Stevens car and were south or to the right of the center line of Frederick Avenue at all times; he stated that he saw the headlights of the LaSalle going westward; that there were no barricades in front of their car or in the line of their traffic; that he heard the LaSalle strike something and then its lights flashed in his face, and it collided with their car; that the collision sent the Ford sideways to the south or southeast and the Stevens car hit the right side of the Ford; that the Ford crossed over the south curb and stopped in the yard of Dr. Byrne; and that he turned off the ignition.

Plaintiff's Exhibit A was a photograph of the Ford after the collision and shows that the impact of the collision was at the left front wheel, fender and headlight; the right fender and headlight were undamaged. Exhibit B was a photograph of the LaSalle which indictated that it was struck from about the center of the front end and to the left, and pushed the metal parts backward.

Witness Kneib, an assistant prosecuting attorney, drove east along Frederick Avenue at about seven-thirty p.m. and noticed the barricade and that there were no flares or lanterns; and shortly thereafter he returned along the same street and found the accident had just occurred. He stopped, got out of his car and walked across the street "just west of the holes" to the south side and shortly thereafter the police came; that the LaSalle had been moved before he got there; that the Ford was in Dr. Byrne's yard, and the Stevens car had stopped about six feet east of the hole in the street and near the south curb; that he saw debris all over the street, some to the north and some to the south of the center. The only skid mark he saw was one starting about four or five feet south of the center line and leading toward the Ford; that it appeared to turn sharply to the southeast and was all south of the center line.

Louis Blankenship testified for the city and stated that he was a member of the street crew that resurfaced the excavation with concrete on May 10, about two p.m.,

and that he put up two barricades but could not recall leaving any lanterns; that the city had a "red light man" who was supposed to do that and that is the reason he did not place any red lanterns or lights there.

. George Blankenship testified that he was employed by the street department of the city and that he went to the scene of the accident the next day and found some glass and metal on top of the repaired excavation to the north of the center line.

Mr. Zimmerman identified a plat of Frederick Avenue at the point of collision and stated that there had been two excavations, one to the north and the other to the south of the center line; that the distance between the center line and the south end of the north cut was 4.1 feet; that the north cut was 5½ feet north and south and 3½ feet east and west. It is conceded that the south excavation in no way contributed to the accident and is not involved in this case.

Shortly after the accident, four policemen arrived at the scene, Officers Cobb, Turcotte, Thompson and Lt. Stark. Officers Cobb and Thompson were there but a few minutes and were ordered to take Mrs. Bratcher to the hospital; they made no observations. Officer Turcotte testified that it was not his duty to investigate traffic accidents and that he was ordered by Lt. Stark to direct traffic. He did state that at the time he arrived, all of the LaSalle was north of the center line of the street.

Lt. Stark testified that he was in the traffic department of the St. Joseph Police Department and that it was his duty to investigate traffic accidents; that he was notified of the collision and arrived within a few minutes after receiving the notice; that he first went to the Ford, which was in Dr. Byrne's yard, and found Dr. Byrne administering to some young man in the Ford; that he then returned to the south curb where he met the driver of the LaSalle and she stated to him, "I hit the barricade and just as I hit it, this other car came over on the wrong side of the street and hit me and then hit another car,

and that is it over in the yard." He stated that he then proceeded to make an investigation of the physical facts and found that the LaSalle was approximately five or six feet east of the north excavation; that the front end of the LaSalle was headed south and east of the north excavation and all of it north of the center line; the Ford was in Dr. Byrne's yard and the Stevens car was slightly east of the barricade and in the south lane of traffic close to the south curb; that he traced tire marks from the rear of the Ford back to the northwest to the north excavation in the street, approximately 53 feet, and thence west and approximately ten feet north of the center line for about 43 feet; he referred to these marks as "skid marks"; that there was glass, dirt, oil and water just north of the center line; that because of his training and experience in traffic matters, he could tell how fast a car is going by the skid marks it leaves on the pavement; that considering the skid marks of 43 feet west of the point of collision and assuming that the driver reacts 100% and the brakes are in 100% condition, then the car was being driven 33.3 miles per hour; however, if he deducted 5% under efficiency instead of 100%, then the car was being operated at 49.9 miles per hour. This opinion evidence was admitted without objection.

■ Unquestionably, Lt. Stark's testimony conflicts with plaintiff's evidence, but the weight thereof was for the jury. Certainly plaintiff's evidence is not against physical laws as argued by the city.

We should add that Mrs. Bratcher died of natural causes before the trial and did not give testimony concerning the accident.

■ In support of its contention that the evidence was overwhelmingly in favor of the city as a matter of law, it cites Carner v. St. Louis-San Francisco Ry. Co., 338 Mo. 257, 89 S.W.2d 947; Dunn v. Alton R. Co., 340 Mo. 1037, 104 S.W. 2d 311; and Freeman v. Terminal R. Ass'n, 341 Mo. 288, 107 S.W.2d 36. The facts in those cases distinguish them from the question we have under consideration and

cannot be considered controlling. The contention that plaintiff's evidence is contrary to the physical facts is without merit and cases cited in support of that proposition are easily distinguishable.

The court did not err in overruling the city's motion for a directed verdict.

The appellant's second contention is that the court erred in sustaining the pretrial motion of Schultz to dismiss the petition; and at the close of plaintiff's evidence in sustaining motions for directed verdicts offered by defendants Wyeth and Whitman. The basis of this contention is that these three defendants had co-operated in illegally securing a permit to make the excavation on Frederick Avenue and that this "was the first link in the continuous chain of events leading down to the accident". There was considerable evidence concerning the circumstances surrounding the issuance of the permit but under our view of the question of ultimate liability, we think it is unnecessary to detail such evidence.

■ It is undisputed that defendant Whitman made the excavation approximately 30 days before the accident; that immediately upon making the sewer, water and gas connections, the excavation was filled with dirt and gravel flush with the street surface and that he maintained barriers, and lights at night, over such excavation for about two weeks and then removed the same, leaving the surface of the excavation level with the street and that such portion of the street had been used by the traveling public for at least two weeks; that prior to the time of the accident the city had elected to make the permanent resurfacing of the street under an ordinance which provides: "that in the event the city as hereinafter provided elects to do the refilling and/or repaving or resurfacing of the cut or excavation, the principal shall not be liable on said bond after the city actually commences the work of refilling and/or repaving or resurfacing * * *. The person making such cut or excavation shall pay to the city, when the city repairs or refills said cut or excavation,

the following charges * * *." It is also undisputed that on the day of the accident the city employees removed a portion of the dirt from the excavation and filled it with concrete and erected a barrier but failed to provide a lantern or flare after sundown, as it was required to do by ordinance. Under all the evidence, that failure was the *proximate* cause of the accident. The question whether the permit was regularly or irregularly issued, under the facts in this case, is beside the point. Its relation, if any, to the cause of the accident is too remote. There is no evidence that Whitman was negligent in making or refilling the excavation or in not maintaining proper warnings before the city took charge.

■ It is well settled law in this state that the violation of a statute or an ordinance must be the *proximate* cause of the injury before a recovery can be had because of such violation. Cantwell v. Cremins, 347 Mo. 836, 149 S.W.2d 343, 346; Larsen v. Webb, 332 Mo. 370, 58 S.W.2d 967 loc. cit. 970, 90 A.L.R. 67; Krelitz v. Calcaterra, Mo.Sup., 33 S.W.2d 909. In Acker v. Kansas City, Mo.App., 104 S.W.2d 1055, this court held that it was proper to sustain a motion for directed verdict for the Kansas City Power & Light Co., which had secured a permit to make an excavation in the street and after refilling it, the city assumed the obligation of making the permanent repairs. It is true the legality of the permit was not questioned in that case, but under the conceded facts in this case we have no doubt the *proximate* cause of the accident was the city's negligence after assuming the duty to make the permanent repairs.

Appellant cites Delaney v. Philhern Realty Holding Corp., 280 N.Y. 461, 21 N.E.2d 507, Interstate Sash & Door Co. v. City of Cleveland, 148 Ohio St. 325, 74 N.E.2d 239, 240, and Morris v. E. I. Du Pont de Nemours & Co., 341 Mo. 821, 109 S.W.2d 1222. The facts in those cases make them inapplicable to the question presented here.

■ The court did not err in sustaining the motions of Wyeth and Whitman for a directed verdict.

With reference to the question whether the trial court erred in sustaining defendant Schultz' motion to dismiss the petition as to him, we are confronted with a motion by said defendant to dismiss the appeal as to him for the reason: that his motion was sustained by the court on October 31, 1951; that the trial of the other defendants did not begin until Feb. 20, 1952; that final judgment was rendered on Feb. 28, 1952, and the city's motion for new trial was not filed until March 7; *consequently not within 10 days after defendant Schultz' motion had been sustained.* He contends that such an order was a final judgment as to him and that the plaintiff or the city could have and should have perfected their appeal within 10 days thereafter. In support of this contention he cites Runnion v. Paquet, Mo.App., 233 S.W.2d 803; Coyne v. Southwestern Bell Tel. Co., 360 Mo. 991, 232 S.W. 2d 377; Jones v. Williams, 357 Mo. 531, 209 S.W.2d 907; Section 510.150 RSMo 1949, V.A.M.S.

■ Those cases hold that an order sustaining a motion to dismiss on the ground that no cause of action is stated is an adjudication upon the merits as well as a dismissal with prejudice, unless the trial court shall otherwise specify, and that it is a final judgment. However, in those cases there was but one defendant and the order sustaining the motion disposed of the whole case on the merits and as to all parties. That is not the situation we have here. There were three other defendants *jointly* charged with Schultz and the sustaining of his motion did not finally dispose of *all issues* and *all parties*, and an appeal by either the plaintiff or the defendant city at that time would have been premature. There can be but one final judgment and it must dispose of all issues and parties and the appeal must be taken from that judgment. See S. S. Kresge Co. v. Shankman, Mo.App., 194 S.W.2d 716; State ex rel. Thompson v. Terte, 357 Mo. 229, 237, 207 S.W.2d 487; Kidd v. Katz Drug Co., Mo.

App., 244 S.W.2d 605; Wicker v. Knox Glass Associates, Inc., 362 Mo. 614, 622, 242 S.W.2d 566; Sections 511.020 and 512.-020 RSMo 1949, V.A.M.S. For this reason the motion of defendant Schultz to dismiss the appeal is overruled.

■ However, since we hold that the evidence does not make a submissible case against defendants Wyeth and Whitman, and the theory of Schultz' liability is based upon the same pleadings and evidence as is the liability of Wyeth and Whitman, it would serve no useful purpose to discuss the question whether the petition states a cause of action as to Schultz, because no submissible case can be made against him and nothing would be accomplished by reversing and remanding the cause, even if the petition stated a cause of action against him.

Appellant's last contention is that the verdict of $6500 is excessive and that we should order a substantial remittitur. Plaintiff was 16 years of age at the time of the accident and had been working at a grocery store earning $22.50 per week. He was taken to the hospital immediately after the accident and examined by Dr. Grant; he was in the hospital two weeks and four days and then returned to his home and was in bed most of the time for the next two weeks; his leg was in a cast for five or six weeks and he was on crutches for two additional weeks and then began using his leg, but could not put all of his weight on it without pain and it caused him to limp; he went back to work the latter part of July, 1950, and continued to work at the grocery store until the following February, when he secured employment at the Whitaker Cable Corporation in St. Joseph and at the time of the trial was earning $42 per week.

Dr. Grant testified that he found contusions, abrasions and cuts on the face and particularly the upper eyelid and the right side of the nose; that his face was pale and bloody; that he was definitely "in shock". The injuries to the face had completely healed with the exception of some discoloration of the eyelid and a scar,

slightly disfiguring. When the doctor arrived at the hospital, he found plaintiff partially conscious but his pulse was very weak and his blood pressure very low; he could not obtain a pulse at the wrist; he was given two units of blood plasma immediately and as soon as possible was given a blood transfusion and on the next day was given another transfusion; he had lost considerable blood by internal hemorrhage and the doctor diagnosed his condition as a ruptured liver which would cause discharging of blood into the abdominal cavity; for six days he had grave doubts whether the patient would live and in his opinion he would not have lived without the plasma and blood transfusions; he was also given oxygen from the beginning; he also found that plaintiff was suffering from ileus or paralysis of the bowels and to relieve this condition a tube was inserted through the nose down through the stomach and for two or three feet below the stomach into the intestines and left there for about eight days; he also found a fissure fracture at the lower end of the femur and extending into the knee joint; the term "fissure fracture" is used to describe a fracture which does not separate or dislocate the bone; that a fracture at this point is "more likely to cause knee trouble" than if it had been above the knee; he also found a fracture of the ninth rib about two inches from the breast bone cartilage. Shortly before the trial and about two years after the accident, Dr. Grant examined the plaintiff and found that both fractures had healed remarkably well, but that plaintiff complained of pain and discomfort at the knee and that such pain was likely the result of the injuries.

Dr. McDonald examined the plaintiff shortly before the trial on behalf of the appellant and gave it as his opinion that the plaintiff had made an excellent recovery and that there is no permanent disability as a result of the accident.

Plaintiff testified that he remembered very little while in the ambulance on the way to the hospital or while the doctors were examining him; but later he suffered pain all through his body and particularly

his abdomen; that he vomited blood; in addition to the time spent in the hospital and at home, as mentioned above, he stated that his leg continued to bother him and did not coordinate well and that he could no longer run or roller skate or play ball as he had done prior to the injuries; that since the accident he has not been able to eat fats or fried foods because they sour. (According to Dr. Grant, this could be the result of the rupture of the liver.)

In support of its contention that the verdict is excessive, appellant cites several cases, all of which were decided prior to 1929. Without taking the time to distinguish these cases on the facts, suffice it to say that they are of little value in determining whether this verdict is excessive because we must now take into consideration the present economic conditions, current costs and the purchasing power of the dollar, which are vastly different from the conditions existing at the time those cases were decided. The general rule is that the function of assessing damages is peculiarly that of the jury, whose duty in a case of liability is to award such a sum as will reasonably compensate the plaintiff for the injuries sustained. The jury's discretion is conclusive on appeal unless the verdict is so grossly excessive as to indicate an arbitrary exercise and abuse of discretion. The verdict is excessive when it offends against all sense of right, indicates that it results from passion and prejudice, and shocks the judicial conscience, but an appellate court should not interfere with the action of the jury unless the injustice of the size of the verdict is manifest. In these days of inflation a higher level of maximum damage is warranted, and the failure of the trial court to set aside the verdict as excessive or to order a remittitur is a fact which we must take into consideration. Arl v. St. Louis Public Service Co., Mo.App., 243 S.W.2d 797, 800; Peterson v. Kansas City Public Service Co., Mo.Sup., 259 S.W.2d 789, 795. We are unwilling to say the verdict is shockingly excessive.

The judgment is affirmed.

All concur.