ZONA GRAHAM, Administratrix of Estate of THOMAS GRAHAM, v. FRANK A. THOMPSON, Trustee of and for the St. Louis-San Francisco Railway Company, a Corporation, and THE KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Appellants.—No. 39898.—212 S. W. (2d) 770.

Court en Banc, May 27, 1948.

Rehearing Denied, July 12, 1948.

1134

[redacted]

*M. G. Roberts, E. G. Nahler, Thos. E. Deacy* and *Milligan, Kimberly & Deacy* for appellant Frank A. Thompson, Trustee.

1136

· *S. W. Sawyer, John H. Lathrop, James F. Walsh* and *Sam D. Parker* for appellant Kansas City Terminal Railway Company.

1138

*Ben W. Swofford, Robert L. Jackson, Ronald Shankland* and *Edward D. Franey* for respondent; *Swofford, Jackson & Shankland* and *Hay & Flanagan* of counsel.

*Warner Fuller* and *Arnot L. Sheppard* for Terminal Railroad Association of St. Louis, amicus curiae.

1140

1142

[772] CONKLING, J.—This case was first argued and submitted in Division 2 of this Court. After opinion in that Division, of the Court's own motion, the case was transferred to the Court En Banc. After reargument and resubmission there, the case came to the writer upon re-assignment. After opinion in the Court en banc, a rehearing was granted. The case was again re-argued and resubmitted at our January, 1948 session, and again came to the writer upon re-assignment.

Thomas Graham, a switchman employee of the Kansas City Terminal Railway Company (hereinafter called Terminal), in the course of his regular duties as such switchman, was assisting his regular Terminal switching crew in an interstate switching movement for Terminal in the yards of his employer about 5 P. M., on August 27, 1943. While so engaged he was struck and killed by Frisco passenger train No. 20 moving generally west on track 2 through Terminal's yards on its way to the Union Station. The passenger train was operated by defendant Thompson, as trustee of St. Louis-San Francisco Railway Company. In this action under the Federal Employers' Liability Act (45 U. S. C. A. Sec. 51 et seq.) his wife, plaintiff below, as administratrix, recovered a judgment of $20,000.00 against both Frisco and Terminal. Each railroad appealed and each urges that its separate motion for a directed verdict should have been sustained.

Plaintiff concedes Graham was in fact a Terminal employee but pleaded and contends that inasmuch as Terminal owned the

tracks through the Terminal yards upon which Frisco was then operating its train, and that Terminal by written contract of lease had granted Frisco the right to operate its train thereover, that both railroads are liable to plaintiff under the Federal Act by virtue of Mo. R. S. A. Sec. 5163, the Missouri lessor-lessee statute. That statute, in part, provides "whenever any . . . railroad . . . shall lease its road or tracks or any part thereof to any other company or corporation, . . . the company or corporation so leasing its road, . . . shall remain liable for all acts, debts, claims, demands, judgments and liabilities of the lessee or licensee, . . . the same as if it (the lessor or licensor) operated the road, itself; and such lessee or licensee shall likewise be held liable and may sue and be sued in all cases and for the same causes, and in the same manner, as if operating its own road. . . . And suit may be brought upon any such claim, debt, lien or liability against either the corporation to whom any such sale, transfer, lease, or assignment has been made, . . . or against both such corporations, jointly, at the option of such claimant." Plaintiff relies on that statute and upon such cases as North Carolina Railroad Company v. Zachary, 232 U. S. 248, 34 S. Ct. 305, 58 L. Ed. 591; Spaw v. Kansas [773] City Terminal Ry. Co., 198 Mo. App. 552, 201 S. W. 927; Smith v. Thompson, (Mo. Sup.) 182 S. W. (2d) 63; Miller v. Terminal Railway Assn. of St. Louis, 349 Mo. 944, 163 S. W. (2d) 1034; and Francis v. Terminal Railway Assn. of St. Louis, 354 Mo. 1232, 193 S. W. (2d) 909. Plaintiff says she made a case for the jury upon a failure to give a warning under the humanitarian theory of negligence.

Frisco contends that as Graham was not its employee there is no liability against it under the Federal Act; that in the switching operation Graham was performing no service for Frisco and that it had no control or right of control over Terminal's operations or over Graham; that as to it Terminal was an independent contractor in the switching movement; that the Federal Act uses the words "employed" and "employee" in their natural sense to describe the conventional relationship; that in that the relationship of employer and employee did not in fact exist between it and Graham the Federal Act cannot apply to it; that under the instant facts the lessor-lessee statute cannot make an employee of the lessor road also an employee of the lessee railroad and that the Zachary case, supra, and other cases purporting to follow the Zachary case, do not compel such holding. Frisco relies on such cases as Hull v. Philadelphia & R. Ry. Co., 252 U. S. 475, 40 S. Ct. 358; Robinson v. Baltimore & Ohio R. Co., 237 U. S. 84, 35 S. Ct. 491, 59 L. Ed. 849; Stevenson v. Lake Terminal R. Co., 42 Fed. (2d) 357, and others. Terminal concedes that by the lessor-lessee statute it is liable for Frisco's negligence, if any, but contends no jury case was made.

The underlying basic reason for the enactment of the Federal Employers' Liability Act was to secure uniformity of both right and remedy in interstate commerce cases without regard to whether the action is brought in any state or in any federal court. Mooney v. Terminal R. Assn. of St. Louis, 352 Mo. 245, 176 S. W. (2d) 605; C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 474, 46 S. Ct. 564, 70 L. Ed. 1041. Both the state and federal courts were given concurrent jurisdiction by the Federal Act and the right of removal was withheld. To attain such uniformity in all courts there had to be a dominant statute. Its purpose was to supplant the numerous state statutes and their varying applications in each state as to who could recover, against what railroad and under what circumstances. Congress chose to and did enact such a dominant statute. The Federal Employers' Liability Act "withdrew all injuries to railroad employees in interstate commerce from the operation of the varying state laws" and put all such actions under a national law of uniform operation in all states. New York Central R. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045.

The very act of Congress, therefore, under which plaintiff now seeks to recover took possession of and preempted the entire field of liability of carriers by railway for injuries sustained by their employees in interstate commerce and that act superseded all state laws and statutes by which such liability could be sought to be fastened upon rail carriers in such cases. Second Employers' Liability Cases, 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327; Chesapeake & Ohio R. Co. v. Stapleton, 279 U. S. 587, 590, 73 L. Ed. 861, 864; Chicago, Milwaukee & St. Paul R. Co. v. Coogan, supra; Toledo, St. Louis & W. R. Co. v Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513; New York Central R. Co. v. Winfield, supra; Mooney v. Terminal Railway Assn. of St. Louis, supra. The rights and liabilities of parties to an action under the Federal Employers' Liability Act must be determined by the provisions of that Act. Hoch v. St. Louis & San Francisco R. Co., 315 Mo. 1199; Toledo St. Louis & W. R. Co. v. Allen, supra; Chicago, Milwaukee & St. Paul R. Co. v. Coogan, supra; Brady v. Southern Ry. Co., 320 U. S. 476, 64 S. Ct. 232.

All state laws upon the subject of the responsibility of railroads to their employees engaged in interstate commerce having been superseded by enactment of the Federal Act, all state laws with respect thereto, both common law and statutory [774] law, of any and every kind or character, gave way where they enlarge or diminish or conflict with the Federal Act. The lessor-lessee statute is such a state law; it being the instrumentality by which it is here sought to fasten liability upon the lessee railroad under the Federal Act. But the Federal Act has made that Act applicable only to employees of railroads sought to be so charged with such liability. 45 U. S. C. A. Sec. 51; Hull v. Philadelphia & R. R. Co., supra. The Federal Act is con-

trolling, exclusive and supreme with respect to which railroads shall be held liable thereunder. In Michigan Central R. Co. v. Vreeland, 227 U. S. 59, 33 S. Ct. 192, 57 L. Ed. 417, the Court in speaking of the Federal Act said: "We may not piece out this Act of Congress by resorting to the local statutes of the state of procedure or that of injury". In New York Central & H. R. R. Co. v. Tonsellito, 244 U. S. 360, 37 S. Ct. 620, 61 L. Ed. 1194, the Court said: "Congress having declared when, how far, and to whom carriers shall be liable on account of accidents in a specified class, such liability can neither be *extended* nor abridged by common or statutory laws of the state". See also, Chesapeake & Ohio R. Co. v. Stapleton, supra.

Except for the Missouri lessor-lessee statute there could be no basis for plaintiff's contention that Frisco is liable under the Federal Act, and that the Zachary case, supra, is an authority here. Plaintiff's position, in effect, is that that state statute enlarges the Federal Act and extends to her under the instant facts the coverage and benefits of the Federal Act. She urges that the state statute extends to her and creates in her the right of action she now asserts against Frisco and that by that statute such liability is fastened upon Frisco under the Federal Act. Plaintiff thus seeks to use the state statute not as mere adjective or procedural law but as substantive law (Maurizi v. Western Coal & Mining Co., 321 Mo. 378, 11 S. W. (2d) l. c. 272; Barker v. St. Louis County, 340 Mo. l. c. 1001, 104 S. W. (2d) 371) upon which her claimed cause of action against Frisco is made to depend, and without which her claimed cause of action against Frisco could not exist. Thus plaintiff seeks to use the lessor-lessee statute to "piece out" and enlarge the scope and application of the Federal Act to assert and maintain her action against Frisco and to hold Frisco liable under the Federal Act. That cannot be done.

By the Federal Act Congress fully preempted the entire field and determined that a carrier is liable to *its* employees under the circumstances stated in the Act. To "piece out" and extend the coverage of the Federal Act by any local law, statutory or common, would destroy the uniformity of operation of the Federal Act in the various states. The rule must be the same in Missouri as elsewhere. If it were otherwise one rule would obtain in Missouri, and in states having no lessor-lessee statute a contrary rule would obtain. Thus uniformity of right and remedy as to such interstate commerce cases would be destroyed. Neither the contract of lease nor the Missouri statute above referred to can create a liability upon Frisco under the Federal Act where none is created by the Federal Act itself.

It is said that no adjudicated case squarely holds that the Federal Act has preempted the field as to who is or is not an employee within the purview of the Act. But the Act provides that "common carriers by railroad while engaged in commerce between any of the several states . . . shall be liable in damages to any person suffer-

ing·injury *while he is employed* by such carrier in such commerce''. (Emphasis ours.) The use of the words ''while he is employed'' is a 'full preemption of that field. If the words of the Act above italicized or if the sense in which they were intended by the Congress to be used or understood need any interpretation, we find it in Robinson v. Baltimore & Ohio R. Co., *supra*, wherein a Pullman car porter on a car attached to a Baltimore & Ohio train sought recovery from the railroad for injuries sustained in a collision of trains due to the negligence of the Baltimore & Ohio. In ruling that Robinson was not an employee of the railroad within the Federal Act the court said: ''For the 'liability created' by the act is a liability to the 'employees' of the carrier, *and not to others*; and the plaintiff [775] was not entitled to the benefit of the provisions unless he was 'employed' by the railroad company within the meaning of the Act. . . . We are of the opinion that Congress used the words 'employee' and 'employed' in the statute in their natural sense, and intended to describe *the conventional* relation of employer and employee. It is well known that there were on interstate trains persons engaged in various services for other masters. Congress, familiar with this situation, did not use any appropriate expression which could be taken to indicate a purpose to include such persons among those to whom the railroad company was to be liable under the Act.'' (Emphasis ours.) Webster's New International Dictionary defines *conventional* as, ''formed by agreement or contract; stipulated, contractual—opposed in law to legal and judicial''. It appears Congress intended an employment in fact and not one created by a legal fiction. Under the Federal Act itself, and the above decisions of the United States courts construing the Act, it is obvious that it was the intention of the Congress to, and that it did, occupy and take over the full field as to who should be entitled to the benefits of the Act. Factual situations such as are presented by this record were foreseeable by the Congress and in the Act there is nothing to indicate any Congressional purpose or intention that any person other than an actual *employee* should come under the Act.

In Missouri, Kansas & Texas R. Co. v. West, 134 Pac. (Okla.) 655, in discussing the meaning of the words ''while he is employed by such carrier'', as contained in the Federal Act, the Court said: ''The language of the Act of Congress carries with it the idea and the essence of a contract. To be employed by one is to be engaged in his service, to be used as an agent or substitute in transacting his business; to be commissioned and intrusted with the management of his affairs. In our judgment, the words, 'while employed by such carrier,' construed in connection with the context, is equivalent to 'while hired by such carrier,' which implies a request and a contract for compensation. The persons falling within the meaning of the Act are those hired by the railway company, or those who are work-

ing for it at its request and under an agreement on its part to compensate them for their services". By the express terms of the Act the carrier is liable to its employees only. The courts are without power to extend the liability of a carrier to one not the railroad's servant and employee, he being a stranger to the railroad sought to be held liable. It was certainly the intention of the Congress to limit the beneficiaries to those only in the relation of servant to the master. By the plain terms of the Federal Act Congress did so limit it.

Plaintiff further contends that Graham was engaged in interstate commerce for Frisco as Frisco's employee because of the fact that in the Terminal freight train which Graham was helping to switch there were two freight cars which Terminal later delivered to Frisco on an interchange track in Kansas. Terminal was a common carrier railroad (Terminal Railroad Assn. v. U. S., 266 U. S. 17, 31, 45 S. Ct. 5, 69 L. Ed. 150): Terminal and Frisco were merely connecting carriers. At the time of Graham's death each railroad, a separate entity, was engaged in its own separate operation. Frisco and Terminal each retained complete control of its own train crew. While on Terminal's tracks the Frisco crew must comply with Terminal's rules and train orders to co-ordinate and make safe all train movements which, of course, promoted the general purposes of the agreement between the two railroads. Yet the operation by each was separate and distinct from that of the other. Terminal's switch crew (including Graham) were engaged in switching freight cars on and off of tracks numbered 1, 112, 252 and 4730. Frisco was operating a local passenger train from Springfield, Missouri, to Kansas City, Missouri, and on into the Union Station over Terminal's track 2. Track 2 was separate and distinct from tracks 1, 112, 252 and 4730. The latter three were switch or industrial tracks and all led into track 1. There was no connection between track 1 (used for Terminal switch trains exclusively) and track 2. Frisco had no license to use track 1. The bare fact that two cars in the Terminal drag were later delivered to Frisco in Kansas cannot serve as a legal [776] fiction to make Graham an employee of Frisco, when in truth and in fact he was not such. In moving those two cars, and the other freight cars in the Terminal drag, Terminal did so wholly as a connecting carrier, and as to such movement was merely an independent contractor so far as Frisco is concerned. Frisco had no control or right of control over either Graham's or Terminal's operations in that switching movement. It merely later received the cars in Kansas as a connecting carrier. The contention is ruled against respondent.

Plaintiff contends that the instant case is ruled by North Carolina Railroad Company v. Zachary, supra, claiming, in her brief, that the Zachary case involves "similar local law". We cannot agree with that contention. Analysis of that case demonstrates it did not turn upon a question of similar or dominant local law and does not

support respondent's present contention. In that case, Zachary's intestate, an employee of Southern Railway, was accidentally killed by the negligence of Southern Railway. Zachary sued North Carolina Railroad, which owned the line of railroad upon which Southern was then and there operating. The North Carolina Railroad had theretofore leased to Southern its tracks and other property, North Carolina's only activities then being to receive the rents under its lease and to distribute same to its shareholders.

In the Logan case, infra, an action at common law, cited in the Zachary opinion as demonstrative of the North Carolina local law, defendant, the North Carolina Railroad Company, in 1871, leased its line from Goldsboro to Charlotte to the Richmond & Danville Railroad Company for a period of thirty years. Richmond & Danville was operating the road when Logan was injured while employed by Richmond & Danville as a section hand. The North Carolina statute mentioned in the Logan case had been passed in response to the decision of that court in State v. Rives, 5 Ired. (Law) 297 (1844). The last case criminally charged Rives with destroying a railroad, when after securing a judgment against the railroad he levied upon and sold under sheriff's sale the line of railroad from Margaretsville to Concord to one Rochelle, who then assigned to Rives. The latter then secured a sheriff's deed and removed a certain portion of the track. The prosecution was on the theory that Rives had obstructed a highway when he tore up the rails breaching the line of railroad. The result of the •case was that Rives had a right to remove the track, but no right to sell the franchise under that execution. Later the North Carolina legislature passed a statute providing for the sale of the franchise as well as the track, and requiring a purchaser under such circumstances to continue to operate the railroad. The Supreme Court of North Carolina said in Gooch v. McGee, 83 N. C. 59, that that statute was passed in direct response to the decision of that court in State v. Rives. That was the statute referred to in the Logan case, and which compelled the purchasers of the property on execution to continue to operate it as a railroad. The opinion in the Logan case was not based on a statute at all. The statute above mentioned was but casually referred to in the court's opinion.

Thus it is noticed that what is referred to in the Zachary opinion as a "local law, as laid down in Logan v. N. C. R. Co., 116 N. C. 940, 21 S. E. 959", and also referred to in Hull v. Philadelphia & R. R. Co., supra, as "a dominant rule of local law" had nothing at all to do with whether Zachary's intestate, who was actually an employee of the Southern Railway only, was also an employee of North Carolina Railroad Company at the time he was killed. What the Court said in the Zachary case must be considered in the light of that case, and in the light of the facts of Logan v. North Carolina R. Co., supra; State v. Rives, supra; and Gooch v. McGee, supra. See Morse v.

Consolidated Underwriters, 349 Mo. 785, 163 S. W. (2d) 586; Maryland Casualty Company v. Zahner, (Mo. App.) 190 S. W. (2d) 996, 1000.

The Zachary case definitely does not rule that an employee of a lessor railroad automatically becomes an employee of a lessee railroad for the purpose of the Federal Act if and when injured by lessee's sole and [777] separate operations, and that case is no authority here. This case is ruled by Hull v. Philadelphia & R. R. Co., supra, decided some eight years after the Zachary case, and by Robinson v. Baltimore & Ohio R. Co., supra.

Under the facts presented by this record, the ruling in Spaw v. Kansas City Terminal Railway Company, supra; Smith v. Thompson, supra; Miller v. Terminal Ry. Assn., supra, and other cases which, it is contended by plaintiff, follow the Zachary case upon the local law theory, are no authority for plaintiff's contention that an employee of a lessor railroad automatically becomes an employee of a lessee railroad for the purpose of the Federal Act, if and when injured by lessee's sole and separate operations. The case of Francis v. Terminal Railway Assn., supra, is quite different from the instant case. There an employee of the Terminal Railway sued only his employer for injuries caused by being struck by a backing engine of Terminal's lessee, the Wabash. No contention was there made and it was not there ruled that the lessor-lessee statute made the lessor's employee an employee of the lessee for the purpose of the Federal Act. The Spaw case is readily distinguishable upon facts. While in Terminal's general employment, Spaw, when injured, was engaged in re-railing an engine for the Milwaukee road. When injured he was actually engaged in doing Milwaukee's work. While thus engaged in interstate commerce for Milwaukee, not for Terminal, he was injured. Spaw was in fact a Milwaukee employee.

Smith v. Thompson, supra, cited by plaintiff, does not hold an employee of a lessor becomes an employee of a lessee railroad for purposes of the Federal Act if injured by the lessee's separate operations. In that case deceased was an employee of lessee. Lessee's negligence, there adjudicated, merely created an unsafe working condition for its own employee which resulted in his death when he was run over by lessor's train while it was engaged in a switching movement. Lessor and lessee were jointly sued under the Federal Act and lessor, by its instruction, voluntarily submitted its own liability to the jury under the lessor-lessee theory. An examination of that instruction in our files shows it is an admission of lessor's liability if the jury found lessor leased to lessee and lessee was found to be negligent.

Likewise, Miller v. Terminal Ry. Assn. of St. Louis, supra, is no authority here. That case does not rule that an employee of a lessor became an employee of lessee for the purposes of the Federal

Act when injured by lessee's separate operations. In that case Miller was in fact an employee of Terminal, the lessor, and the action was brought against his employer alone, who there conceded both Miller and it were then engaged in interstate commerce. While actively engaged in his duties for his employer as a switchman, a Mobile & Ohio train struck the rear of the train upon which Miller was at that time at work (standing on the rear drawbar), and his death resulted. We there held the Federal Act applied as between Miller and *his* employer. It was not there sought to hold the Mobile & Ohio (the lessee) liable. We have carefully considered all the cases cited by plaintiff, but for reasons herein stated, we believe they have no application under the instant facts.

Recovery by the plaintiff against Frisco under the Federal Act depends upon proof of an employer-employee relationship between Frisco and plaintiff's decedent. The existence of that relationship is the foundation of the cause of action respondent asserts against Frisco. The question must be and is here determined under legal principles as recognized and applied by the Federal Courts. The act being remedial is to be liberally construed to advance the remedy proposed, but we believe it is plain that the Congress intended it to apply only when the relation of master and servant actually exists. Mooney v. Terminal Ry. Assn. of St. Louis, 352 Mo. 245, 176 S. W. (2d) 605; Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 46 Sup. Ct. 564, 70 L. Ed. 1041; Hull v. Philadelphia & R. R. Co., supra; Robinson v. B. & O. R. Co., supra; Stevenson v. Lake Terminal R. Co., supra. Not being an employee of Frisco that railroad is not liable under the Federal Act for Graham's death.

[778] In the circuit court and here upon appeal Terminal admitted, and it has been the theory of Terminal throughout the case, that Graham was its employee, that both Graham and it were engaged in interstate commerce and that if Frisco was negligent the case was one to be submitted to the jury. Terminal committed itself to that theory and is now bound by it. Wisner v. Mutual Life Ins. Co., 352 Mo. 673, 676, 179 S. W. (2d) 39; Knorp v. Thompson, 352 Mo. 44, 175 S. W. (2d) 889. As Frisco's lessor, Terminal is liable under the Federal Act for the death of its own employee if Frisco was negligent. Terminal has contended, however, that Graham was also Frisco's employee within the meaning of the Federal Act (which question we above rule adversely). Terminal further contends Frisco was not negligent. We therefore examine Terminal's last stated contention.

At the place of the fatal occurrence (between two and three miles east of the Union Station) Terminal's mainline tracks numbered from the north, are tracks 1, 2, 3 and 4. All inbound passenger trains running west toward the Union Station there run west over track 2 at high speeds. All outbound passenger trains running east

away from the Union Station there run east on track 3 at high speeds. Track 1 lies next north of and parallel to track 2, and tracks 112, 252 and 4730, the last three being industrial switch tracks, each led into track 1 from the north. Graham's switching crew were moving freight cars onto and off of track 1, a freight switching track, and the above numbered industrial tracks. All the switching by Graham's crew was being done north of track 2. There were eight or nine cars connected with the east end of the Diesel switch engine, which was about to move from an industrial track onto track 1. Graham was south of track 2. The switch foreman was at switch 252, which was northeast of Graham. The latter was about fifty feet east of the 18th Street viaduct, 500 feet west of his foreman and was relaying signals to his fireman, Weathers.

Frisco passenger train No. 20, westbound on track 2, was approaching at its usual speed of 45 miles per hour. The day was clear and Graham's view east on track 2 was unobstructed for a quarter of a mile. The Frisco enginemen likewise had an unobstructed view to the west.

Terminal says that the Frisco enginemen were looking ahead and that as soon as Graham entered a zone of peril, 150 feet in front of the approaching passenger train, an alarm by whistle was promptly sounded and any duty to warn was thus discharged. The Frisco fireman, Groves, testified that he was looking ahead and first saw Graham when his train was about 600 feet east of the 18th Street viaduct. Groves stated that Graham at that time was standing between the rails of track 3; that Graham was signaling and appeared to be looking toward the oncoming train; but that when the front of the engine was only 150 feet from Graham the latter stepped over the north rail of track 3, and that although short alarm blasts of the whistle were quickly sounded, Graham walked into the side of the Frisco engine.

But Weathers, the fireman on the Terminal engine, testified that Graham was standing only eighteen inches or two feet south of the south rail of track 2 (within the overhang of a train on track 2) "passing signals from the field man to me"; that Graham was 50 or 75 feet east and a little south of him; that "the train was coming from the east, all right, but he (Graham) was looking a slight bit across the tracks, not direct in line with the (Frisco) train. . . . He (Graham) was looking northeast . . . at the time he was doing the signaling. . . . He was standing sort of parallel, maybe slightly turned a little bit to me and looking over his right shoulder"; that when he (Weathers) first saw the Frisco train it was three hundred to four hundred feet, or more, east of Graham, and after that time Graham "never was in the clear of that rail. He was in danger of the track at all times he was standing there". It was Weathers' testimony that Graham gave a stop signal, then looked at Weathers, stepped up to the south rail of track 2, saw Weathers yelling at him

(Graham) and stopped, "I guess he was trying to figure out what I was trying to tell him", and then "turned and looked up (east) and saw the train. He never saw the train until it was practically on top of him . . . I don't [779] believe it was over ten feet from him, at the most." He was instantly struck and killed. The testimony. is sufficient to support a submission and finding that Graham was oblivious of the approach of the Frisco train until just instantly. before he was struck. Weathers testified the warning whistle was not sounded.

Plaintiff submitted her case to the jury in her instruction 1 upon Graham's actually discovered and not his discoverable peril. Terminal concedes Frisco's duty to warn upon actual discovery of peril. Whether the duty to sound an alarm by blowing the whistle arose when the engine was 150 feet from Graham, as Groves testified, or 400 feet or more from Graham, as Weathers testified, was a question for the jury alone to determine. Evans v. Atchison, T. & S. F. R. Co., 345 Mo. 147, 153, 131 S. W. (2d) 604, 607; Moran v. Atchison, T. & S. F. R. Co., 330 Mo. 278, 48 S. W. (2d) 881. Under the evidence of record before us the jury could reasonably conclude that had a warning by whistle been timely sounded upon Groves' first discovery of Graham, the latter might have been alerted to his danger and his "rendevous with death" avoided. Evans v. Atchison, T. & S. F. R. Co., supra; Tavis v. Bush, 280 Mo. 383, 217 S. W. 274. The trial court did not err in the submission made to the jury as against Terminal.

It is next contended by Terminal that plaintiff's instruction 1 is erroneous in first defining the general obligation under the Federal Act, in part, as "the duty to exercise ordinary care". It is urged that the jury might possibly have misconstrued the quoted words to embrace the duty to discover peril. But the instruction thereafter expressly stated the duty of the railroad's enginemen to warn arose upon actual discovery of peril. The instruction was clear, unambiguous and correct under the law. The jury could not possibly have been misled. The instruction in the form given has been so many times approved that citation is unnecessary. The point is ruled against Terminal.

It is last contended the court erroneously admitted certain railroad rules governing employees which required the adoption of a safer course in cases of doubt and the maintenance of a constant lookout ahead. These rules were not pleaded or submitted. Nor are they essential to a finding of negligence in this case. Since they were used merely to demonstrate duty, not to predicate liability, and certainly since the case was submitted solely on the discovered peril theory, any validity of Terminal's objection thereto has long since passed out of the case.

357 Mo.—73.

·The judgment of the circuit court is reversed as to appellant Frank A. Thompson, Trustee of and for the St. Louis-San Francisco Railway Company. As to appellant, the Kansas City Terminal Railway Company, the judgment of the circuit court is affirmed. It is so ordered. *Clark, Douglas, Ellison* and *Hyde, JJ.,* concur; *Tipton, J.,* concurs in result as to Terminal, and dissents as to Reversal as to Frisco, and concurs in separate concurring and dissenting opinion of *Leedy, C. J.; Leedy, C. J.,* concurs in result as to Terminal, and dissents as to Reversal as to Frisco in separate concurring and dissenting opinion.

LEEDY, C. J.—I concur in the result of the principal opinion (affirmance) as to defendant Terminal, but am unable to agree that the judgment should be reversed as to defendant Frisco, and so dissent to that portion of the opinion. Still entertaining the views expressed in the opinion of Barrett, C., in Division II, by which the judgment was affirmed as to both defendants, I adopt it, as follows:

While Thomas Graham, a Kansas City Terminal Railway Company switchman, was assisting in a switching movement in the Terminal's yards he was struck and killed by a Frisco passenger train. In this action under the Federal Employers' Liability Act against both railroads his wife, as the administratrix of his estate, recovered a judgment of $20,000.00. Upon this appeal by the railroads it is urged that the [780] trial court should have sustained their separate motions for directed verdicts. Both railroads claim that the plaintiff's evidence does not make a submissible case under the Missouri humanitarian doctrine. The Frisco Railroad contends, in so far as its liability is concerned, that the Terminal was an independent contractor in the switching movement, that the evidence does not establish that it was engaged in interstate commerce and, in any event, that Graham was not employed by it and, therefore, for all these reasons it is not liable to the administratrix under the act.

Graham was a Terminal employee and the plaintiff does not claim that he was as a matter of fact a Frisco employee, but to establish the Terminal's liability for the Frisco's negligence and the Frisco's liability under the Federal Act the plaintiff pleaded that the Terminal owned the tracks and, by written agreement, granted and leased to the Frisco the right to use the tracks and, therefore, both railroads were liable as employers to Graham's administratrix. "Whenever any railroad . . . shall lease its road or tracks or any part thereof to any other company or corporation, . . . the company or corporation so leasing its road, . . . shall remain liable for all acts, debts, claims, demands, judgments and liabilities of the lessee or licensee, . . . the same as if it (the lessor or licensor) operated the road, . . . and such lessee or licensee shall likewise be held liable and may sue and be sued in all cases and for the same causes, and in the same manner, as if operating its own road:

. . . " Mo. R. S. A., Secs. 5163, 5164. The Terminal admits that it is made liable for the Frisco's negligence by this statute and urges along with the respondent that the Frisco is likewise made liable by this statute for the Terminal's liability under the Federal Act. Smith v. Thompson, (Mo.), 182 S. W. (2d) 63; Swain v. Terminal R. R. Assn., 220 Mo. App. 1088, 291 S. W. 166. The Frisco points to the act (45 U. S. C. A., Sec. 51) and contends that the words "employee" and "employer" are used in the act in their natural sense and describe the conventional relationship of employer and employee and argues that unless the relationship exists in fact that there is no liability on its part under the act. Hull v. Philadelphia & R. Ry. Co., 252 U. S. 475, 40 S. Ct. 358, 64 L. Ed. 670.

It may be assumed that the Frisco's contention is correct, in general. However, the cases upon which it relies do not demonstrate that the Missouri statute does not alter the situation. Schleappe v. Terminal R. R. Assn., 339 Mo. 562, 98 S. W. (2d) 616; Chicago & Alton R. R. Co. v. Wagner, 239 U. S. 452, 36 S. Ct. 135, 60 L. Ed. 379 and Friedman v. Vandalia R. R., 254 Fed. 292, were not actions under the Federal Act. In the Hull case, supra, it was specifically pointed out that a dominant rule of local law might alter the relationship of the parties in this respect but no such law was involved in that case or in Robinson v. Baltimore & O. R. R. Co., 237 U. S. 84, 35 S. Ct. 491, 59 L. Ed. 849, although there was a contract between the two railroads. The mere fact of an agreement or lease between the companies may not create liability. Stevenson v. Lake Terminal R. Co., 42 Fed. (2d) 357. But, if the action is under the act and its conditions are otherwise met and apply, a state law may alter the situation and fasten liability upon a railroad when in fact the conventional relationship of employer and employee does not exist. North Carolina R. R. Co. v. Zachary, 232 U. S. 248, 34 S. Ct. 305, 58 L. Ed. 591.

The Frisco contends, in the circumstances of this case, however, that the Missouri statute does not change the situation. It says that the Federal Act controls over the state statute and, in any event, is inapplicable here. However, the Congress has not legislated upon this specific subject and the field has not been occupied or preempted by the Federal government or its agencies so as to make the Federal laws and regulations paramount. Smith v. Thompson, (Mo.) 182 S. W. (2d), l. c. 66. As has been previously pointed out there is no conflict between the Federal Act and these statutes, hence the statutes have not been abrogated by the Federal Act. Francis v. Terminal R. R. Assn., (Mo.), 193 S. W. (2d) 909, 911. The Frisco argues, nevertheless, that if it had owned the track upon which Graham was killed that it might have been liable to the administratrix under the state wrongful death statute but not under the Federal Employers' Liability Act and [781] the fact that Graham was a Terminal employee

engaged in interstate commerce does not alter the situation. In other words, the Frisco contends that it was not intended by the state statute to extend or increase its liability merely because it operates over the tracks of another under a lease but that its liability remains the same as if it owned and operated the road and, consequently, its liability in this case is measured by the law of the forum only. Shaffer v. Chicago, R. I. & P. Ry. Co., 300 Mo. 477, 254 S. W. 257. The Frisco quotes the clause "and such lessee or licensee shall likewise be held liable and may sue and be sued in all cases and for the same causes, and in the same manner, *as if operating its own road* : . . . ," and seizes upon the underscored phrase. And it would seem, standing alone, that the phrase and even the whole act up to that point do not clearly make the lessee's or licensee's liability co-extensive with and as broad as the licensor's or lessor's liability. But the statute continues and in the same sentence says that a satisfaction in full of any claim or judgment by either company shall discharge the other. Then the statute says: "And suit may be brought upon any such *claim,* debt, lien *or liability against either the corporation to whom any such* sale, transfer, *lease,* or assignment *has been made,* . . . *or against both such corporations, jointly,* at the option of such claimant, . . . ." Thus, considering the statute as a whole, it plainly appears that the lessee's or licensee's liability is not limited to the liability of an owner but its liability is extended by the statute to include its lessor's liability. The effect of the state statute, in this respect, is to make Graham an employee of both railroads. We have re-examined Spaw v. Kansas City Ter. Ry. Co., 198 Mo. App. 552, 559-562, 201 S. W. 927, 929-930, and it is indistinguishable in principle from the present case and, we think, correctly decided. See also North Carolina R. R. Co. v. Zachary, supra, and Armstrong v. C. & W. I. R. R. Co., 350 Ill. 426, 183 N. E. 478. It follows as of course if the Terminal was under the act and engaged in interstate commerce at the time that there was no error in instruction four's hypothesizing the railroads' liability upon their relationship under the lease for, if it existed, the requisite relationship of employee and employer follow under the Missouri statute. For the same reason it would not be necessary for instruction one to require a finding that Graham was the Frisco's employee. Smith v. Thompson, (Mo.) 182 S. W. (2d), l. c. 69-70; Spaw v. Kansas City Ter. Ry. Co., supra; Miller v. Terminal R. R. Assn., 349 Mo. 944, 163 S. W. (2d) 1034.

The Frisco does not deny that the Terminal and its employee Graham were engaged in interstate commerce and particularly so with respect to two cars which it later delivered to the Frisco on an interchange track in Kansas. But the Frisco argues that as between it and the Terminal, particularly in the movement of these two cars, the Terminal was an independent contractor and, therefore, the Frisco could not be Graham's employer. What we have said with reference

to the Missouri statute probably disposes of this point, but in any event the argument here is rather factitious than sound. The Terminal is a common carrier by rail (Terminal R. R. Assn. v. U. S., 266 U. S. 17, 31, 45 S. Ct. 5, 69 L. Ed. 150) and the test under the Federal Act is whether it and its employee were engaged in interstate commerce and not whether it was an independent contractor. 45 U. S. C. A., Sec. 51; Sheehan v. Terminal R. R. Assn., 336 Mo. 709, 81 S. W. (2d) 305; North Carolina R. R. Co. v. Zachary, supra. Graham, in his relationship with the Terminal, was not an independent contractor as was the case in Chicago, R. I. & P. Ry. Co. v. Bond, 240 U. S. 449, 36 S. Ct. 403, 60 L. Ed. 735. As between the Terminal and the Frisco the relationship may have been that of independent contractor, nevertheless the Terminal may be an employer subject to the act (Cimorelli v. New York Cent. R. Co., 148 Fed. (2d) 575) and the Frisco likewise liable as an employer by force of the Missouri statute. Spaw v. Kansas City Term. Ry. Co., supra.

Both railroads contend that the plaintiff's evidence does not permit an inference of the existence of certain conditions essential to the application of the Missouri humanitarian doctrine and, therefore, her case must fail. They say that the plaintiff's evidence shows that Graham was not oblivious of his peril at the time he was [782] struck and that there is no substantial evidence that he was oblivious within the meaning of the humanitarian doctrine. They urge, under the evidence, that prompt warning was given as soon as Graham was actually discovered in peril. He was a switchman and his duties required him to work in the yards upon and near the tracks and it is contended, therefore, that there was no duty upon the Frisco to warn him until he was actually seen in a position of peril. In this connection it is urged that the court erred in instructing the jury because there was no evidence upon which to hypothesize Graham's obliviousness and the instruction imposed a greater duty upon the railroad than that imposed by the law. It is also contended that the court erred in admitting in evidence various rules of the railroads which were not pleaded or relied upon as a basis for recovery.

Tracks two and three in the Terminal's yards are "hot tracks" upon which passenger trains continuously run into and out of the station. The Terminal crew was engaged in switching cars on and off of tracks designated as 112, 252 and 4730. These tracks were all entered by way of switches off of main track one. Just prior to the accident one car was connected with the west end of the switch engine and eight or nine cars were attached to the east end of the engine. The switch engine was moving westwardly towards Graham and the movement contemplated was to move the string of cars far enough to the west on track 112 to clear switch 252, 495 feet east of the point switch 112 connected with main line track one. To com-

plete this movement it was necessary for the switch engine to enter upon track one. Graham's foreman was at 252 switch, seventy-five feet north and 500 feet east of the accident. Graham was about fifty feet east of the 18th Street viaduct, 500 feet west of his foreman, giving signals to his fireman on track 112. In passing the signals to his fireman Graham was standing between tracks two and three. The Frisco passenger train was westbound on track two traveling at its usual speed of approximately forty-five miles an hour. It was a clear day and Graham had an unobstructed view down track two of a quarter of a mile. The appellants say that Graham was relaying signals from his foreman, Hall, at switch 252, about 500 feet to the east and, therefore, could not have been oblivious of the oncoming train. It is said that in taking signals he was looking in the direction of the passenger train, in his line of vision with nothing to obstruct his view and, consequently, he could not have been oblivious. Furthermore, the Frisco fireman and engineer said that Graham was looking towards the passenger train.

But, this argument ignores and fails to give force to certain of the plaintiff's evidence. Moran v. Atchison, T. & S. F. Ry. Co., 330 Mo. 278, 48 S. W. (2d) 881. Weathers, the Terminal fireman who was receiving Graham's signals, said that Graham was standing between tracks two and three, about a foot and a half or two feet from the south rail of track two or a foot from the ties of track two—within the overhang of passing cars. He said: "The train was coming from the east, all right, but he (Graham) was looking a slight bit across the tracks, not direct in line with the train. . . . he was looking to the north and east. . . . He was standing sort of parallel, maybe slightly turned a little bit to me and looking over his right shoulder." Weathers says that Graham gave a stop signal "and then he started looking at me. . . . When he finished the signal he looked up at me and he took one, maybe two, steps, placing him right alongside the rail, and he seen me yelling at him and he looked up while he was looking at me, and he stopped, I guess, trying to figure out what I was trying to tell him, and he turned and looked up and saw the train." Weathers stated that when Graham gave the stop signal the train was then three or four hundred feet to the east and from that time "never was in the clear of that rail." The foreman, Hall, said that when the train was near him at switch 252 Graham was between tracks two and three walking west with his back to him. In these circumstances the essential fact of Graham's obliviousness (Pentecost v. St. Louis Merchants Bridge Ter. R. R. Co., 334 Mo. 572, 66 S. W. (2d) 553) was for the jury,—an inference of fact they could resolve either way under the evidence and the hypothesis of the instructions. Womack v. Missouri [783] Pac. R. R. Co., 337 Mo. 1160, 1166-1167, 88 S. W. (2d) 368, 371; Jordan v.

St. Joseph Ry., L., H. & P. Co., 335 Mo. 319, 326, 73 S. W. (2d) 205, 208.

Graham was a switchman in a Terminal yard and, therefore, the appellants seek to invoke the rule that the Frisco had a right to expect a clear track and was under no duty to maintain a lookout or to warn him until after his peril was actually discovered—a duty it completely fulfilled when its engineer gave the warning blast by whistle upon seeing Graham 150 feet away. Degonia v. St. L. I. M. & So. Ry. Co., 224 Mo. 564, 123 S. W. 807; Rashall v. St. L. I. M. & So. Ry. Co., 249 Mo. 509, 155 S. W. 426; Martin v. Wabash Ry. Co., 325 Mo. 1107, 30 S. W. (2d) 735; Pentecost v. St. L. M. Ter. R. R., 334 Mo. 572, 576, 66 S. W. (2d) 533. It is in this connection that the appellants' rules and their objections to their admission become important. It is also the basis of their contention that instruction one erroneously imposed upon them a duty greater than that required by the law. The rule they contend for, the right to expect a clear track, the duty of yard and track employees to look out for themselves and the duty to warn only upon actual discovery of peril, applies only in the absence of the existence of a rule or custom to the contrary. Goodwin v. Missouri Pac. Ry. Co., 335 Mo. 398, 407, 72 S. W. (2d) 988, 991. The rules, requiring train crews to take the safer course in case of doubt and to maintain a constant lookout, were not pleaded or relied upon, nor were they essential as demonstrating negligence in this case. Jones v. St. Louis-S. F. Ry. Co., 325 Mo. 1153, 30 S. W. (2d) 481; Kirkland v. Bixby, 282 Mo. 462, 222 S. W. 462. The rules were not used here for the substantive purpose of predicating liability upon a breach of the rules (Martin v. Wabash Ry. Co., 325 Mo., l. c. 1134-1136, 30 S. W. (2d), l. c. 748) but were used rather for the evidentiary and collateral purpose of showing that there was a duty to maintain a lookout—the breach of which might have some force under the humanitarian doctrine. Clark v. Terminal R. R. Assn., (Mo.) 111 S. W. (2d) 168; State ex rel. Pelligreen Const. Co. v. Reynolds, 279 Mo. 493, 498, 214 S. W. 369; Mayfield v. Kansas City So. Ry. Co., 337 Mo. 79, 91, 85 S. W. (2d) 116, 123. Since the rules were used solely for the purpose of evidencing the appellants' duty they were admissible without having been pleaded and did not enlarge the Frisco's duty under the law. Norton v. Wheelock, 323 Mo. 913, 926, 23 S. W. (2d) 142, 147; Terminal R. R. Assn. v. Schorb, 151 Fed. (2d) 361, 364. Aside from the problem of the admissibility of the rules as bearing on the Frisco's duty to maintain a lookout, however, the question now argued loses its significance in this case because the railroads' liability was in fact hypothesized upon Graham's actually discovered and not his discoverable peril and upon this theory the appellants claim to have fulfilled their obligations. Evans v. Atchison, T. & S. F. Ry. Co., 345 Mo. 147, 153, 131 S. W. (2d) 604, 607.

The railroads, in urging that their motions for directed verdicts should have been sustained, say that the Frisco engineer was looking and promptly gave an alarm by whistle as soon as he saw Graham in peril 150 feet away and thus discharged any duty to warn. This argument, however, leaves out of view other inferences reasonably drawn from the evidence. The Frisco fireman, Groves, likewise says that the engineer gave the warning alarm when Graham was 150 feet away, just as he stepped over the north rail of track three. He said, however, that he first saw him when the train was about 600 feet from the viaduct and something less than that distance from Graham. His excuse for not then warning him was that Graham was between the rails of track three at that time, looking in his direction, and was never in danger of being struck until the train was but 150 feet away. But, as we have previously noted, Weathers, the Terminal fireman said that when the Frisco train was 500 feet from Graham and continuously during its approach that Graham was in danger of being struck by the overhang of the cars. The Frisco fireman admitted a duty and ability to warn upon the appearance of danger. The railroads concede a duty to warn upon actually discovering Graham's peril and whether that duty arose at 150 feet as the appellants' witnesses say or at 400 or 500 feet as the respondent's witnesses say was another fact for the jury to resolve. Evans v. Atchison, T. & S. F. [784] Ry. Co., supra; Moran v. Atchison, T. & S. F. Ry. Co., 330 Mo. 278, 48 S. W. (2d) 881. . . .

The motions for directed verdicts were properly overruled, . . . and as there was no error . . . the judgment should be affirmed.